05-4302-cv
Russo v. City of Bridgeport

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2005

(Argued: May 17, 2006                    Decided: February 27, 2007
                                         Amended: June 12, 2007)[*]

Docket No. 05-4302-cv

_____

CHRISTOPHER RUSSO,

*Plaintiff-Appellant*,

v.

CITY OF BRIDGEPORT, JEREMY DePIETRO, Officer, JOHN ROSA, Officer,
CHRISTOPHER BORONA, Detective, and JOHN SHERBO, Sgt.,

*Defendants-Appellees*.

_____

Before: KEARSE, CALABRESI, and POOLER, *Circuit Judges*.

_____

Appeal from a judgment of the United States District Court for the District of Connecticut
(Thompson, J.) granting the defendants' motion for summary judgment.  Affirmed in part,
vacated and remanded in part.


BURTON M. WEINSTEIN, Weinstein, Weiner, Ignal, Napolitano & Shapiro, Bridgeport, CT,
*for Plaintiff-Appellant*.

BARBARA BRAZZEL-MASSARO, Office of the City Attorney, Bridgeport, CT, *for
Defendants-Appellees*.

_____

_____

[*] The panel has, *sua sponte*, amended its opinion.  The mandate should issue forthwith.

CALABRESI, *Circuit Judge*:

In a case of mistaken identity, Plaintiff-Appellant Christopher Russo ("Russo") was arrested and imprisoned for the armed robbery of an Amoco service station and convenience store in Bridgeport, Connecticut. Two hundred and seventeen days after his arrest — and one day after the prosecutor viewed, for the first time, Amoco's videotape of the crime — the state requested a *nolle prosequi,* and the charges against Russo were dismissed.

Russo brought this action pursuant to 42 U.S.C. § 1983 ("§ 1983"), against the City of Bridgeport ("the City") and four city police department employees — Officer Jeremy DePietro ("DePietro"), Officer John Rosa ("Rosa"), Detective Christopher Borona ("Borona"), and Sergeant John Sherbo ("Sherbo") — collectively, "the officers" or "the individual defendants-appellees." He claimed, *inter alia*, that, in violation of the Fourth Amendment, the officers and the City subjected him to false arrest and false imprisonment. He also claimed that the City and the individual defendants-appellees violated his Fourth and Fourteenth Amendment rights by keeping him incarcerated for a long time after his arrest, despite his protestations of innocence and the availability of exculpatory facts and evidence.

The district court granted summary judgment to the City and to all the individual defendants-appellees. We affirm in part, and vacate and remand in part.

**BACKGROUND**

On August 1, 2002, an armed, unmasked person robbed an Amoco auto service station in Bridgeport. The cashier described the criminal as a white male in his late 30s, between 5'6" and 5'8" tall, of medium build with a very short, blond crew cut. The crime was recorded on videotape by a security camera.. Officer Rosa went to the scene of the incident.

Officer DePietro, who was assigned by Sergeant Sherbo to investigate the robbery, obtained the videotape of the robbery on August 1, 2002. After using a video-photo machine to freeze still photographs of the criminal, DePietro prepared a mug shot photo array by matching the assailant's facial characteristics to faces in the police photo identification database. Russo's picture was included in this line-up, and the Amoco cashier identified Russo as the robber, stating that he was "one hundred percent sure" of his identification. Based on this evidence,[1] police obtained and executed a warrant for Russo's arrest. On September 18, 2002, Russo was charged with first-degree robbery.

Unable to afford the $100,000 bail that was set, Russo remained in custody for more than seven months, until April 23, 2003, when the charges against him were dismissed. The dismissal happened because the videotape taken by the surveillance camera showed that "both sides of the perpetrator's left arm and one side of the forearm, and one side of the perpetrator's right forearm," were free of any tattoos. Russo, by contrast, had prominent tattoos on his forearms, hands, neck, and legs, and, as noted in the arresting officer's report, they were there at the time of his arrest on September 18, 2002.

Indeed, in an earlier, 2001 arrest report on file with the Bridgeport police department, individual defendant-appellee Rosa documented the existence of "King Tut," "demon-devil," and "tribal art" tattoos on Russo's two forearms, in addition to other tattoos on Russo's upper arms and legs.[2] No evidence in the record or argument by the government suggests that Russo lacked

---

[1] The police did not conduct a live line-up, and it is undisputed that the cashier never saw a picture of Russo that included any part of his body below his face.

[2] The district court made no factual findings with respect to Russo's tattoos, and we are unable to glean from the photographic reproductions in our record whether Russo's hands were also tattooed in 2001, as they were at the time of his arrest in 2002.

arm tattoos on the date of the robbery or had somehow managed to mask them from the victim or the video camera's view.[3]

In addition to the distinctiveness of his tattoos, Russo's physical characteristics were different in important respects from those of the Amoco robber, as described by the cashier. At the time of Russo's arrest for that robbery, Russo was listed by the police as being a 27-year-old white male, 6'0" tall, of medium build, who weighed 200 pounds and had brown hair, but was balding. He was, therefore, younger, taller, balder, and with different colored hair than the person whom the victim had described to the police.

Construing the evidence in the light most favorable to Russo, the following events occurred during the 217-day period of Russo's custody. Upon his arrest on September 18, 2002, Russo was taken for interrogation by individual defendants-appellees DePietro and Borona, whom he had never met before. The officers questioned Russo about the robbery for two hours, seeking his confession. The officers informed Russo that they had video surveillance of him committing the robbery, and they showed him a photographic still that had been "ripped or folded" to show only the robber's head. Russo protested that he could not be the person in the photograph because of the shape of the criminal's head, nose, and hairline. He also told the officers to watch the videotape to see whether the perpetrator had body tattoos.[4] The officers left

_____

[3] The district court's speculation — which was never suggested by any of the defendants and was unsupported by any evidence — that Russo could theoretically have covered his tattoos with make-up prior to the robbery and that the police officers may have relied upon this fact in making their judgments about handling the evidence, was inappropriate on a motion for summary judgment. *See, e.g., Baker v. Home Depot*, 445 F.3d 541, 543 (2d Cir. 2006) (restating the well-settled rule that a federal court is "constrained, in reviewing a ruling on a motion for summary judgment, to resolve all ambiguities and draw all inferences in favor of [] the nonmoving party").

[4] In his deposition, Russo testified that he raised the issue of his tattoos immediately with the officers after learning of the videotape showing the robber, "[b]ecause being into tattoos the way I am, the first thing about me that makes me original is my tattoos."

-4-

the interrogation room and returned a while later holding a magnifying glass and a ruler. They then informed Russo that the videotape showed a perpetrator with tattoos. Russo, nevertheless, refused to plead guilty to the robbery.

After the questioning, DePietro came to Russo's holding cell one or two additional times seeking a confession in exchange for giving Russo access to the hospital methadone program.[5] . The officers "kept on dismissing" the issue of his tattoos. Russo also continued to press the other differences between his and the perpetrator's face and insisted that this showed his innocence

From the day of the robbery through a date after November 25, 2002, DePietro, who was the lead investigating officer on the robbery, had possession of the videotape. DePietro and Borona stated that they viewed the videotape, and testified that they "did not notice tattoos" on the perpetrator. Individual defendant Sherbo, the sergeant who had assigned DePietro to investigate the robbery, attested that he did not watch the videotape, because, in his view, the eyewitness identification confirmed the assailant's identity and made it unnecessary to view the surveillance footage. There is no dispute that after the date of the interrogation, there was no further contact between Russo and DePietro and Borona.

After learning of the videotape through the questioning, and believing — based on the officers' representations — that the robber had tattoos of the same size and location as he did, Russo told his appointed attorney and later his retained counsel that he wished to prove his innocence by seeing the tape of the robbery in order to compare his own tattoo imagery to that of

---

[5] At the time of the interrogation, Russo was experiencing early signs of substance withdrawal, specifically, aching in his knees. He testified, however, that "[he] was very clear in everything [he] saw and said that day."

the perpetrator. At Russo's first court appearance for arraignment and bond-setting on September 19, 2002, Russo's appointed public defender did not raise the issue of the videotape to the judge.

At a hearing before the state court, likely to have occurred in early October, the prosecutor successfully countered Russo's lawyer's request that the court compare Russo's tattoos to those of the perpetrator.[6] On November 1, 2002, Russo's counsel moved for the production of any exculpatory material, and it is undisputed that the videotape was not produced at this time. On December 2, 2002, Russo's trial attorney issued a written letter in which he specifically asked to view the tape.

On November 19, 2002, an investigator for the Office of the State Attorney visited the Bridgeport Police Department property room to obtain the videotape. The investigator found that the tape was missing. Sometime after November 25, 2002, the investigator obtained the tape from Officer DePietro, who had it locked in a drawer of his desk. Later, the state investigator watched the tape and determined that he could not see the perpetrator clearly. On January 3, 2003, he requested a laboratory enhancement of the footage, which he received on January 22, 2003.

Later, at an unknown date before April 9, 2003, Russo's trial attorney was finally allowed to watch the tape. Immediately thereafter, he told the state investigator that the person on the tape could not be his client. The videotape was not actually surrendered to the defense until Russo was released in late April, 2003.

---

[6] Neither party submitted a transcript of this proceeding, but Russo testified that his parents heard Russo's trial attorney requesting the tape when Russo was not in the courtroom. This testimony was not challenged by the defense.

The state attorney was aware of Russo's "fairly vivid tattoos on his arms as well as on his neck" from the time he first received the case. Yet, because Russo's face resembled the robber's in photo stills taken from the videotape, his office claimed to have been convinced that Russo was the perpetrator until one day before seeking dismissal of the case. Finally, on April 22, 2003, due to defense counsel's continuing "insistence" on Russo's innocence, the prosecutor actually watched the videotape. The following day, after checking with a probation officer to verify that Russo's tattoos predated the crime, the state requested a *nolle prosequi*.

At the hearing to request dismissal of the prosecution, the state attorney noted that "often the less said is better", but he stated:

> So, I had a talk — to sit down with a couple of investigators yesterday to actually view the videotape in the thought that perhaps the videotape gave somehow somewhat of a better view of the perpetrator than the stills that had been developed from the videotape. That, in fact, happened. The videotape shows both sides of the perpetrator's left arm and one side of the forearm, and one side of the perpetrator's right forearm. And there very clearly are no tattoos on any of those.

The court dismissed the case.

As recognized by the district court, the Bridgeport Police Department had exclusive custody of the videotape evidence from August 1, 2002 until at least November 26, 2002, a period of 117 days. Construing the evidence in the light most favorable to the nonmoving party, the record indicates a 68-day time period — between the police interrogation on September 18, 2002 and the earliest date on which the tape may have been obtained from DePietro — during which DePietro and Borona were on notice of Russo's claim of innocence based on his tattoos. The state attorney himself did not watch the videotape as moving picture footage, rather than frozen stills, until more than seven months after Russo's arrest.

Naming the City and the individual officers who conducted his arrest and investigation as defendants, Russo filed a civil rights action in state court. The action was removed to the federal district court on October 17, 2003. Russo there filed a second amended complaint which asserted a failure to train and supervise by the City, as well as false arrest and unreasonably lengthy detention by the City and by the individual defendants. The complaint alleges that both the City and the individual defendants-appellees lacked probable cause for Russo's arrest, demonstrated reckless and malicious indifference to Russo's claims of innocence, and failed to meet their statutory obligation under Connecticut law to disclose exculpatory evidence. In addition to his § 1983 count, Russo claimed false arrest, false imprisonment, negligent infliction of emotional distress, and intentional infliction of emotional distress under state law.

By a brief endorsement order and final judgment dated July 13 and July 14, 2005, the district court granted summary judgment to all the defendants. The court found that Russo's federal constitutional rights had not been violated, and, having dismissed Russo's federal claims, the court declined to exercise supplemental jurisdiction over Russo's state claims.

At oral argument, the district judge expressed his sympathy for Russo given the length of his wrongful incarceration, but he found no Fourth or Fourteenth Amendment violations. He stated that probable cause for Russo's arrest had been established, and that this fact precluded false arrest and false imprisonment claims under § 1983. With respect to Russo's due process claims, the district court did not make specific factual findings about the timing or scope of the state's investigation of the crime or videotape evidence. He did conclude, however, that the evidence was insufficient to show that the videotape was legible enough to exonerate Russo prior to the tape's enhancement in January, 2003. The court went on to reject, as a matter of law, the

-8-

argument that "when the person whose's [sic] been arrested provides an explanation as to why they're not guilty, the police officers violate that person's constitutional rights when they don't go out and investigate the claims made by the person who's been arrested."  Having found no violation of Russo's federal constitutional rights by the individual defendants, the district court rejected the claims against the City without discussion.

**DISCUSSION**

I. Standard of review

"'We review a grant of summary judgment *de novo*, construing the record in the light most favorable to the non-moving party.'" *Hoyt v. Andreucci*, 433 F.3d 320, 327 (2d Cir. 2006) (quoting *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004)).  We will affirm the district court's grant of summary judgment only if, taking all of plaintiff's evidence as true and drawing all inferences in plaintiff's favor, we find that no reasonable juror could conclude that Russo has established that the defendants violated his constitutional rights under circumstances subjecting them to liability under § 1983.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122-23 (2d Cir. 2004); Fed. R. Civ. P. 56(c).

II. Deprivation of constitutional rights

As in any § 1983 case on summary judgment, we first determine whether, "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the [defendants'] conduct violated a constitutional right," *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Farrell v. Burke*, 449 F.3d 470, 499, n.14 (2d Cir. 2006) (quoting same), and only thereafter consider whether qualified immunity shields individual defendants.  Russo argues constitutional tort liability arising under the Fourth and Fourteenth Amendments.  He asserts that his lengthy

detention and the withholding of the videotape from state investigators constituted violations of his right to be free from unreasonable seizures and of his right to due process.[7]

> A.    The Fourth Amendment claim based on false arrest and false imprisonment

Russo's first claim relies on theories of false arrest and false imprisonment. In analyzing claims alleging the constitutional tort of false arrest, "we have generally looked to the law of the state in which the arrest occurred." *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004) (examining Connecticut law to assess a plaintiff's false arrest claim); *see also, e.g., Jaegly v. Couch*, 439 F.3d 149, 151-52 (2d Cir. 2006) (considering New York law). This follows our normal practice with respect to § 1983 claims. *See Davis*, 364 F.3d at 433 n.7.

In a false arrest action, Connecticut law places the burden of proving an unlawful arrest on the plaintiff. *Beinhorn v. Saraceno*, 23 Conn. App. 487, 491, 582 A.2d 208, 210 (1990); *Davis*, 364 F.3d at 433. And, in Connecticut, a false arrest claim cannot lie when the challenged arrest was supported by probable cause. *Beinhorn*, 23 Conn. App. at 491, 582 A.2d at 210. Interpreting an analogous rule under New York law in the context of federal civil rights actions, our court has uniformly rejected Fourth Amendment false arrest claims premised on lawful arrests supported by probable cause. *See Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004); *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). In the present case, the district court properly found that there was no disputed issue of material fact that Russo's arrest was supported by probable cause (the positive identification by the gas station cashier).

---

[7] Russo has abandoned his Sixth Amendment speedy trial claim on appeal. *See* Fed. R. App. P. 28(a)(9)(A) (the appellant's brief "must contain . . . appellant's contentions and the reasons for them").

The more vigorous dispute between the parties — but an equally well-settled issue under Connecticut law — is whether Russo's on-going detention supported an independent § 1983 claim for false imprisonment. As in the case of false arrest, we look to Connecticut state law principles to determine the validity of Russo's federal civil rights claim based on false imprisonment. *See Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001).

Under Connecticut law, "'[f]alse imprisonment, or false arrest, is the unlawful restraint by one person of the physical liberty of another.'" *Outlaw v. City of Meriden*, 43 Conn. App. 387, 392, 682 A.2d 1112, 1115 (1996) (quoting *Green v. Donroe*, 186 Conn. 256, 267, 440 A.2d 973, 974 (1982)). In *Outlaw*, the Connecticut Appellate Court stated that the applicable law for false arrest and false imprisonment "is identical," and therefore "there is no cause of action for false imprisonment if the plaintiff was arrested pursuant to a facially valid warrant." [8] *Id.* at 1115 (describing the continuity of this rule across 180 years of case law); *see also Lo Sacco v. Young*, 20 Conn. App. 6, 20, 564 A.2d 610, 617 (1989) (stating that a claim for false imprisonment may not lie where "the arrest of the plaintiff is legally authorized"); *Love v. Town of Granby*, 2004 WL 1683159, at *4 (D. Conn. July 12, 2004).

The district court's dismissal of Russo's § 1983 claims for false arrest and false

---

[8] Indeed, in *Outlaw*, the Connecticut court of appeals considered the false imprisonment/false arrest claim of a plaintiff who, like Russo, was arrested based on an uncontested warrant, but who was ultimately relieved from charges following exculpatory revelations on the eve of trial. *Outlaw*, 682 A.2d at 1113-14. The court found that in the context of a legally authorized arrest, a plaintiff must show that a state actor misused the "legal process to effect a valid arrest for an improper purpose." *Id*. at 1115 (internal quotation marks omitted). In other words, the plaintiff had to have made a malicious prosecution claim. This Russo has not done.

imprisonment is therefore affirmed.[9]

### B.     The claim based on an unreasonably prolonged detention

The heart of Russo's second claim is that his prolonged detention — caused by the individual defendants-appellees' alleged mishandling of exculpatory evidence and failure to turn that evidence over to the prosecuting attorney which, in turn, prevented the prosecutor from complying with his duty to give the exculpatory evidence to the defense — violated his Fourteenth Amendment right to be free from deprivations of liberty without due process of law. As he did before the district court, Russo argues that the officers willfully mishandled and suppressed two items of exculpatory evidence: (1) the 2001 arrest file showing Russo's prominent tattoos and (2) the moving footage of the surveillance videotape demonstrating that the perpetrator was not tattooed.  In addition, Russo asserts municipal liability by the City of Bridgeport on the theory that a failure to train and supervise these officers led to the deprivations

---

[9] Based on our conclusion that Russo did not make the requisite showing that his arrest lacked probable cause, we need not decide whether a *nolle prosequi* in Connecticut is a *per se* bar to a § 1983 claim of false arrest.  On the one hand, we have stated that "[a] person who thinks there is not even probable cause to believe he committed the crime with which he is charged must pursue the criminal case to an acquittal or an unqualified dismissal, or else waive his section 1983 claim."  *Roesch v. Otarola*, 980 F.2d 850, 853 (2d Cir. 1992).  However, several years later, when we discussed *Roesch v. Otarola* and its Connecticut precedent, we indicated that a judgment of *conviction* was a *defense* to a claim of either malicious prosecution or false arrest, and then went on to say that we were "not aware of any opinion by Connecticut's highest court addressing the issue of favorable termination in the context of a claim for false arrest where there has been *no determination as to guilt*."  *Weyant*, 101 F.3d at 853 (emphasis added).  The apparent tension between these decisions, and their applicability in the context of Connecticut's procedures for entering a *nolle prosequi* specifically, has been the source of disagreement among district judges in this circuit.  *Compare, e.g.*, *Holman v. Cascio*, 390 F. Supp. 2d 120, 125-26 (D. Conn. 2005) (holding that the context of the prosecutor's decision to enter a *nolle* matters, and that such a decision does not, *per se*, preclude initiation of a false arrest suit in federal court) *with Birdsall v. City of Hartford,* 249 F. Supp. 2d 163, 171 (D. Conn. 2003) (holding that a prosecution resulting in a *nolle* is not a favorable termination for the purpose of a false arrest claim).

of Russo's constitutional rights.

### 1. Individual defendants

To hold individual defendants-appellees DePietro, Borona, Sherbo, and Rosa liable in their personal capacity, Russo must show that their conduct violated his constitutional rights and that their actions were taken under color of state law. *See* 42 U.S.C. § 1983; *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994). To make such a "personal" claim, Russo need not establish a connection to governmental "policy or custom." *Hafer*, 502 U.S. at 25.

To prevail on this claim, Russo must establish (1) that he has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) that the actions of the officers violated that right, and (3) that the officers' conduct "shocks the conscience," *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In addition, even if Russo proves these elements, he cannot prevail against the individual defendants if the officers establish that they are entitled to qualified immunity.

In the following subsection (a), we address the three elements of this claim and conclude that Russo has made out a prima facie case with respect to Officer DePietro and Detective Borona. In doing so, we clarify that this type of claim, which has in the past been treated as one based on substantive due process, should be examined under the Fourth Amendment instead. In subsections (b) and (c), we conclude that summary judgment was appropriate as to Sergeant Shero and Officer Rosa. Given these conclusions, subsection (d) examines whether Officer DePietro and Detective Borona are entitled to qualified immunity.

### a. *Officer DePietro and Detective Borona*

-13-

Undisputed evidence shows that both DePietro and Borona had responsibility for investigating the Amoco robbery, with Borona accompanying DePietro to the service station on the date of the crime. Similarly, that evidence establishes that DePietro took control of the surveillance tape on the date of the robbery, viewed the tape, prepared photographic stills from the tape, served as the affiant in the warrant for Russo's arrest, obtained that warrant, and retained the original videotape in his desk drawer through a date that was after November 25, 2002.

Beyond that, the testimony in the case diverges. But read in the light most favorable to Russo, as it must be, the record evidence shows the following. DePietro and Borona questioned Russo and pursued follow-up discussions in which they learned — not necessarily for the first time, as such attributes were on record in police files — of Russo's distinctive physical characteristics, and specifically of his tattoos. They watched the unenhanced surveillance tape, and they represented to Russo that they could see the perpetrator's arms. Then, while concealing the tape, they falsely insisted that it showed a man with tattoos like his. Rather than following police rules on the storage of evidence and the processing of exculpatory evidence, DePietro put the tape in his drawer, thus impeding the state attorney's access to the footage. As a result, and despite Russo's repeated attempts to focus attention on the tape, it took more than six months for that tape to reach Russo's counsel, and more than seven months before Russo was released from prison.

The question of whether such conduct amounted to a deprivation of Russo's constitutional rights is similar to one posed to the Supreme Court in *Baker v. McCollan*, 443 U.S. 137 (1979), in which a plaintiff was arrested pursuant to a valid warrant actually intended for his

brother.[10] *Id*. at 143. The plaintiff remained incarcerated for eight days — despite his protests of innocence and the availability of exculpatory evidence — until the police compared his photograph to that of the wanted man and released the innocent arrestee. *Id*. at 141. The plaintiff brought an action pursuant to § 1983 alleging that the sheriff had failed to institute proper identification procedures in violation of the plaintiff's due process rights. As in Russo's case, the plaintiff's claims were based on law enforcement's conduct after the plaintiff was incarcerated pursuant to a valid warrant.

In *Baker*, the Supreme Court held that the plaintiff's situation — which it found was a "depriv[ation] of his liberty for a period of days" pursuant to a warrant satisfying Fourth Amendment standards — did not, in the circumstances of that case, give rise to a constitutional claim. *Id*. at 144. The Court stated, however: "Obviously, one in [plaintiff's] position could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment." *Id*. at 144. Such protection derived from his constitutional right to a speedy trial. *Id*. (citing *United States v. Marion*, 404 U.S. 307 (1971)). But, going beyond this Sixth Amendment right, the Court suggested that such a prolonged detention could also be understood in terms of the Fourteenth Amendment right to due process of law:

> We may even assume, *arguendo*, that, depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."

*Id*. at 145 (quoting U.S. CONST. amend. XIV, § 1); *see also Wright v. Smith*, 21 F.3d 496, 499 n.1

---

[10] The plaintiff's brother, rather than the police, precipitated the mix-up by identifying himself as the plaintiff in the course of the crime and subsequent proceedings. *See Baker*, 443 U.S. at 140-41.

-15-

(2d Cir. 1994) (quoting same).  The Court made clear, however, that the plaintiff's detention —
"three days over a New Year's weekend"[11] — amounted to no such deprivation.  *Baker*, 443 U.S. at 145.

In a concurring opinion, Justice Blackmun reinforced the Court's due process discussion. He explained that, as he saw it, the majority opinion did not "foreclose the possibility that a prisoner in [plaintiff's] predicament might prove a due process violation by a sheriff who deliberately and repeatedly refused to check the identity of a complaining prisoner against readily available mug shots and fingerprints."  *Id*. at 148 (Blackmun, J., concurring).  In other words, the due process clause might well reach conduct more shocking than that of the defendant in *Baker*. And, Justice Blackmun read the Court's opinion to "conclude[] only that 'every' claim of innocence need not be investigated independently," and that defendant's intent was "relevant to the existence of a constitutional violation."  *Id*.

Following *Baker*, the Eleventh Circuit recognized a Fourteenth Amendment due process right "to be free from continued detention after it was or should have been known that the detainee was entitled to release."  *See Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir. 1993).  In *Cannon*, a sheriff's deputy arrested an innocent woman whose name was similar to that of a fugitive and ignored the arrestee's protestations of innocence.  *Id*. at 1560-61.  The deputy's failure to take any steps to identify the plaintiff as the fugitive, the court held, provided sufficient evidence from which a jury could find that the deputy acted with deliberate indifference towards the plaintiff's due process rights.  *Id*. at 1564.  Similarly, the Ninth Circuit applied *Baker*'s recognition of a due process interest to a twelve-day detention of a plaintiff

---

[11] Plaintiff was incarcerated for a total of eight days, but spent only three days in the custody of the defendant sheriff.

-16-

arrested on valid warrants intended for his twin brother. *See Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002). The court held that the plaintiff "had a liberty interest in being free from a twelve-day incarceration without any procedural safeguard in place to verify the warrant he was detained on was his and in the face of his repeated protests of innocence." *Id.*; *see also Sanders v. English*, 950 F.2d 1152, 1162 (5th Cir. 1992) (holding that the failure to release a pretrial detainee after police officer knew or should have known that plaintiff had been misidentified gives rise to cause of action under § 1983).[12]

And our own court has recognized the due process protection suggested in *Baker*. Thus, in *Satchell v. Dilworth*, we considered the claims of a plaintiff who, following completion of a criminal sentence, had been illegally rearrested and incarcerated for thirty-one days based on misleading and incomplete, if not deliberately false, information provided by state correctional services. 745 F.2d 781, 782 (2d Cir. 1984). The plaintiff, we stated in *Satchell*, might be able to prevail on his due process claims if he could demonstrate that any of the defendants intentionally[13] concealed or conspired to conceal evidence of the plaintiff's completion of his sentence. *Id.* at 785.

Today, we hold that the right mentioned in *Baker* and enunciated in the above cited cases protected Russo from a sustained detention stemming directly from the law enforcement officials' refusal to investigate available exculpatory evidence. The Bridgeport police officers

---

[12] Likewise, the Seventh Circuit, having acknowledged "the general proposition that a warrantless arrest does not support a claim under § 1983 if the arresting police had probable cause," went on to say that this "general rule [] does not preclude *all* § 1983 actions for wrongful detentions that follow constitutional arrests." *Sivard v. Pulaski County*, 959 F.2d 662, 665 (7th Cir. 1992).

[13] As discussed *infra*, *Satchell*'s holding that the plaintiff could also prevail by proving that his unlawful incarceration resulted from negligence has been revisited in light of Supreme Court precedent. *See O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005).

retained sole custody of the videotape evidence — and stored it in an improper manner — for a full 68 days after Russo alerted them that examining the pictures of the perpetrator for tattoos could exonerate Russo. They did this after intentionally misstating that the robber *had* tattoos. Moreover, their failure to perform the simple task of checking the tape resulted in all of Russo's 217-day incarceration.

We must clarify the source of this right, however. Although Justice Blackmun in *Baker* — and several circuits including our own in *Satchell* — have suggested that the right was rooted in substantive due process, we now conclude, in light of more recent guidance from the Supreme Court, that the right should instead be analyzed under the Fourth Amendment. In *Graham v. Connor*, 490 U.S. 386 (1989), decided almost ten years after *Baker*, the Supreme Court stated that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham*, 490 U.S. at 395)). And more recently, in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the High Court noted that *Rochin v. California*, 342 U.S. 165 (1952) — a case on which Justice Blackmun had relied in *Baker* — "was decided long before *Graham v. Connor* . . . and today would be treated under the Fourth Amendment, albeit with the same result." *Sacramento*, 523 U.S. at 849 n.9.

Russo's claim — which he presents as being based on substantive due process — fits comfortably under the coverage of the Fourth Amendment. We have observed that "[w]hen the accused is physically detained following arraignment, there can be no question that he has been

-18-

seized within the meaning of the Fourth Amendment." *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *see also County of Sacramento*, 523 U.S. at 844 ("[A] Fourth Amendment seizure [occurs] . . . when there is a governmental termination of freedom of movement through means intentionally applied." (internal quotation marks and emphasis omitted)); *Oliver*, 510 U.S. at 274 (plurality opinion) ("The Framers considered the matter of pretrial deprivations of liberty and drafted the Fourth Amendment to address it."). And while "we have *generally* looked to the law of the state in which the arrest occurred" in analyzing § 1983 claims based on the Fourth Amendment, *Davis*, 364 F.3d at 433 (emphasis added), the scope of the Fourth Amendment's protection against "unreasonable" seizures is, of course, not limited to state law.

Thus, since the Fourth Amendment provides a more "explicit textual source of constitutional protection," in light of *Graham*, the Fourth Amendment, rather than substantive due process, should serve as "the guide for analyzing these claims." *Graham*, 490 U.S. at 395; *cf. Fontana v. Haskin*, 262 F.3d 871, 881 (9th Cir. 2001) ("'[C]laims arising before or during arrest are to be analyzed exclusively under the fourth amendment's reasonableness standard rather than the substantive due process standard . . . .'") (quoting *Reed v. Hoy*, 909 F.2d 324, 329 (9th Cir. 1990))).

We therefore treat Russo's claim as being based on the Fourth Amendment's protection against unreasonable seizures. And, doing so, we conclude, in light of (1) the length of time of Russo's wrongful incarceration, (2) the ease with which the evidence exculpating Russo — which was in the officers' possession — could have been checked, and (3) the alleged intentionality of DePietro's and Borona's behavior, that Russo has sufficiently alleged that he was unreasonably seized. In other words, the evidence Russo has proffered suffices to prevent

-19-

summary judgment on Russo's claim of a Fourth Amendment violation by DePietro and Borona.

(1)

In *Baker*, the Supreme Court expressly recognized that "the lapse of a certain amount of time" is an element in assessing the existence of a constitutional encroachment. *Baker*, 443 U.S. at 145. Indeed, in one of the precedents relied on in *Baker*, the Court had stated that "[t]he consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975); *see Baker*, 443 U.S. at 143 (citing *Gerstein*). And the *Baker* Court noted that the short duration of the plaintiff's detention was central to the Court's denial of the plaintiff's claims. *See id.* at 145; *accord Davis v. Hall*, 375 F.3d 703, 718 (8th Cir. 2004); *Cannon v. Macon County*, 1 F.3d 1558, 1562 (11th Cir. 1993); *Coleman v. Frantz*, 754 F.2d 719, 724 (7th Cir. 1985). The total 217-day detention here, or even the 68-day detention between Russo's arrest and DePietro's yielding of the tape to the prosecutor, plainly was prolonged rather than short and carried constitutional implications.

(2)

Whether DePietro and Borona watched the tape before (falsely) telling Russo that the robber was tattooed, or failed to follow up on Russo's claims of innocence by refusing to watch the tape at all, their conduct easily fits the hypothetical presented in Justice Blackmun's *Baker* concurrence: that the standard for liability announced by the Court would reach an officer who "refused to check the identity of a complaining prisoner against *readily available* mug shots and fingerprints." *See Baker*, 443 U.S. at 148 (Blackmun, J., concurring) (emphasis added). An officer's duty to investigate specific, readily-verifiable claims of innocence in a reasonable time

period clearly covers reviewing a surveillance camera video record of a crime, when, as here, it was an easily available piece of physical evidence.

(3)

We have said that a substantive due process claim requires more: To trigger liability, a police officer's action must "shock[] the conscience."[14] *County of Sacramento*, 523 U.S. at 846. That is, it must be "'arbitrary in the constitutional sense,'" *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). And, given our decision — following the Supreme Court's admonition in *Graham* — to treat Russo's claim under the Fourth Amendment, the "shock the conscience" requirement must now be understood as a crucial feature going to the "unreasonableness" of the seizure.

The state of mind of a government defendant is an integral aspect of any "shock the conscience" standard. Thus, we have read *County of Sacramento* to mean that while "a purpose to cause harm" might be required in a situation such as a high-speed chase, "deliberate indifference" — but not negligence — can support a finding of liability in situations where the government owes a special duty of care to those in its charge. *O'Connor*, 426 F.3d at 203.

Here, Russo was in state custody — and hence in the charge of the government — throughout the relevant proceedings. Moreover, a reasonable jury could find that DePietro actively hid the exculpatory evidence. As such, his conduct is of a different order from that of

---

[14] The *Baker* majority did not evaluate whether the defendant sheriff's conduct in *Baker* "shocked the conscience." Justice Blackmun, however, did explore the issue in his concurrence. He explained that liability was rejected because "[n]othing in [the sheriff's] conduct suggest[ed] outrageousness." The sheriff, who was new to his position, could only be said to have erred in his failure to supervise adequately his deputies' conduct and there was "no indication that petitioner was aware, or should have been aware, either of the likelihood of misidentification or of his subordinates' action." 443 U.S. at 147-48.

the defendant in *Baker*, where inadvertent omission, rather than an affirmative wrongdoing, led to the detention. *See* 443 U.S. at 143; *see also Whitley v. Seibel*, 613 F.2d 682, 685-86 (7th Cir. 1980) (distinguishing *Baker* and finding liability because of defendant police officers' improper behavior). In addition, by falsely describing the content of the videotape, DePietro and Borona attempted to evoke a confession from him by misrepresenting the very evidence of Russo's innocence that was available to them. This act, combined with their failure to investigate the tape to see if the tape was in fact exculpatory, would readily support a jury finding of either intentional violation of, or deliberate indifference to, Russo's constitutional rights. *See Cannon*, 1 F.3d at 1564 (holding that a defendant's failure to verify that an arrestee was the fugitive sought on the arrest warrant raised a question of fact as to defendant's deliberate indifference toward the plaintiff's due process rights). And, DePietro's failure to follow police procedures with respect to the storage of the exculpatory evidence adds further evidence on the basis of which a jury could find deliberate indifference to Russo's incarceration and to his asserted innocence.

The evidence of shocking conduct on the part of DePietro and Borona was sufficient to preclude a grant of summary judgment in their favor on the merits of Russo's "unreasonable seizure" claim.

> b. *Sergeant Sherbo*

Sherbo, for his part, took DePietro's oath for Russo's arrest warrant application, assigned and supervised DePietro's investigation, and made the determination that it was unnecessary to view the tape personally. Sherbo may not be held liable simply because one or more of his subordinates committed a constitutional tort. "[He] may be found liable[, however, for any]

deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and [his] injury." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). But no evidence was proffered that Sherbo was on notice of Russo's tattoo-based claim of innocence. As a result, no deliberate indifference by Sherbo to Russo's rights has been shown. Similarly, Sherbo's conclusion that the robbery victim's positive identification precluded the need for watching the videotape — standing alone — is in no sense arbitrary, let alone shockingly so. *See County of Sacramento*, 523 U.S. at 846.

Summary judgment with respect to Sergeant Sherbo is therefore affirmed.

c.     *Officer Rosa*

Summary judgment was also appropriate with respect to Officer Rosa, who responded to the Amoco robbery and wrote an incident report. Rosa had arrested Russo in 2001 and had recorded his tattoos in the arrest report that was the reason Russo was in the police database when the 2002 robbery occurred. But the record contains no evidence that Rosa had possession of the videotape, had viewed the surveillance sequence, had transformed it into still photographs, or had prepared the photographic line-up. He had no role or responsibility for Russo's arrest, interrogation, or in the robbery investigation generally. Indeed, Russo did not know him or recognize his name. The district court did not err in dismissing Russo's suit against Officer Rosa.

d.     *Defendants' Qualified Immunity*

-23-

Based on our determination that a reasonable factfinder could conclude that DePietro and Borona's conduct violated Russo's Fourth Amendment rights, we move to the second step of the *Saucier* inquiry and assess whether these officers are entitled to qualified immunity as a matter of law. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: "'(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" *Poe*, 282 F.3d at 133 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998)); *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) (summary judgment is appropriate if "the only conclusion a rational jury could reach is that reasonable officers would disagree about the legality of the defendant['s] conduct under the circumstances"). In this case, neither condition has been satisfied.

First, Russo had a clearly-established constitutional right to be free from prolonged detention caused by law enforcement officials' mishandling or suppression of exculpatory evidence in a manner which "shocks the conscience." *See Baker*, 443 U.S. at 144 (referring to such a right as "[o]bvious[]" in the context of a warranted arrest and protestations of innocence, and doing so as early as 1979); *Wright*, 21 F.3d at 499 n.1 (quoting *Baker*'s statement); *see also Cannon*, 1 F.3d at 1564-65 (holding that a reasonable official would attempt to verify identifying information in the face of the plaintiff's assertions of mistaken identity).

Today we have clarified that Russo's claim should be "treated under the Fourth Amendment," *County of Sacramento*, 523 U.S. at 849 n.9, rather than under substantive due process. But this clarification is of no consequence to the question of whether the right was

-24-

clearly established, because the proper inquiry is whether the *right* itself — rather than its *source* — is clearly established. *See, e.g.*, *Wilson v. Spain*, 209 F.3d 713, 716 (8th Cir. 2000) ("[T]here is no question that [plaintiff's] right to be free from excessive force was clearly established, even if there is some ongoing uncertainty about which constitutional text is the source of that right." (footnote omitted)); *Alexander v. Perrill*, 916 F.2d 1392, 1398 n.11 (9th Cir. 1990) (noting that the only issue before it with respect to qualified immunity was "whether there was a clearly established duty to investigate"; that its prior decision in *Haygood v. Younger*, 769 F.2d 1350 (9th Cir. 1985) (en banc), "answer[ed] that question in the affirmative"; and that "[f]or purposes of this appeal, it is unimportant that the *Haygood* court found the prison officials ultimately violated the plaintiff's right to be free from cruel and unusual punishment, rather than the right to due process and to be free from double jeopardy as alleged in this case").

As to the second condition, the proffered evidence would support a jury finding that DePietro and Borona acted intentionally in hiding exculpatory evidence and misleading Russo as to whether the videotape showed a perpetrator with tattoos. Hence, a reasonable trier of fact need not conclude that it was objectively reasonable for DePietro and Borona to believe their actions were lawful. *See Lennon*, 66 F.3d at 420. And, once again, it is of no consequence that we have clarified the source of this right. The question of reasonable disagreement turns on whether reasonable officers could disagree about *whether* conduct is illegal, not on whether they know the precise constitutional reason *why* it is not lawful.

Qualified immunity to DePietro and Borona is unavailable at summary judgment.

2. City of Bridgeport

-25-

Russo also alleged that the City of Bridgeport failed to train and supervise its officers in the handling of exculpatory evidence. Municipal liability under § 1983 for the conduct of employees below the policymaking level requires that a plaintiff show a violation of his constitutional rights that resulted from a municipal custom or policy. *See Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993); *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). Having rejected Russo's claim of a violation of his constitutional rights, the court below failed to make any factual findings as to the City's policies with respect to police department handling of exculpatory evidence or with regard to the local implementation of Conn. Gen. Stat. § 54-86c(c), which enumerates a state police officer's duty to disclose exculpatory evidence to the state attorney. Nor did the court examine the application of municipal policies by the police department or the individual defendants. In light of our holdings with respect to Russo's constitutional claims, we vacate and remand the judgment of the district court for its consideration of the City's liability in the first instance.[15]

Accordingly, given our holdings with respect to Russo's constitutional claims against DePietro and Borona, summary judgment was inappropriate with respect to Russo's claim against the City.

**CONCLUSION**

If a jury credits Russo's evidence regarding DePietro's and Borona's conduct, and if it finds that the videotape provided adequate verification of Russo's innocence based on his unique physical characteristics, then Russo will have established that he was unreasonably seized by

---

[15] We note that the City has admitted, in its supplemental responses to Russo's requests for admissions, that "all individual defendants . . . acted toward the Plaintiff in accordance with custom, policy and practice." We leave it for the district court to consider, in the first instance, the significance of this concession.

DePietro and Borona, in violation of his Fourth Amendment rights. Russo's long incarceration for the crime of another, in the face of exculpatory evidence that was ignored or actively suppressed, would amount to no less than "a decided lack of solicitude [] for the liberty of [the City's] citizens," *Young v. City of Little Rock*, 249 F.3d 730, 735 (8th Cir. 2001). Moreover, the validity of DePietro's and Borona's assertion of qualified immunity cannot be determined at the summary judgment stage. As such, the district court's grant of summary judgment to DePietro and Borona must be vacated. In addition, given DePietro's and Borona's possible violation of Russo's constitutional rights, and the City's admission that these officers were acting "in accordance with custom, policy and practice," the district court's grant of summary judgment to the City must also be vacated. On the other hand, the district court correctly granted summary judgment to defendants Sherbo and Rosa.

Accordingly, this case is AFFIRMED in part, and VACATED and REMANDED in part for further proceedings. Costs are awarded to the appellant.