PAEZ, Circuit Judge,
concurring in part and dissenting in part:
Although I agree with the majority that Rivera’s Fourth Amendment claims against Los Angeles County and San Ber-nardino County, his Fourteenth Amendment claims against San Bernardino County, and his state law claims against both counties must fail, I disagree with the *394 majority’s analysis of the due process claim in this case. In my view, Rivera has raised a genuine issue of material fact as to whether Los Angeles County deprived him of liberty without due process of law. Accordingly, I respectfully dissent from Part II.C of the majority’s opinion.
I.
As the majority acknowledges, after the lapse of a certain period of time, “a detainee has ‘a constitutional right to be free from continued detention after it was or should have been known that the detainee was entitled to release.’ ” Lee v. City of Los Angeles, 250 F.3d 668, 683 (9th Cir.2001) (quoting Cannon v. Macon Cnty., 1 F.3d 1558, 1563 (11th Cir.1993)). The majority contends, however, that there are just two types of scenarios where a jailer should know that a detainee is entitled to release: (1) circumstances indicate that farther investigation is warranted, or (2) the detainee is denied access to the courts for an extended period of time. Maj. Op. at 390-91. The existence of “significant differences between the arrestee and the true suspect” may warrant additional investigation, but “[ujnsupported claims of mistaken identity ... do not trigger a duty to investigate.” Id. at 390-91, 391-92. Finally, the majority holds that after the detainee appears in court, county officials can never have an obligation to further investigate. Id. at 392-93. Under this view, unless a detainee has the good fortune to (1) exhibit obvious physical or biographical differences from the true subject of the warrant, or (2) possess support for his claim of mistaken identity, county officials are free to ignore his complaints. Furthermore, even the limited duty to investigate obvious indicia of mistaken identity is extinguished once the detainee appears in court. Neither ease law nor logic compel such a cabined understanding of the due process rights of detainees.
Our precedent does not delineate what circumstances must exist before an officer or agency should know that a detainee is entitled to release. It simply mandates that if an officer or jailer should have known that the detainee was entitled to release, “a detainee has ‘a constitutional right to be free from continued detention ....’” Lee, 250 F.3d at 683 (quoting Cannon, 1 F.3d at 1563). The majority treats our existing case law as the outer boundaries of when county officials should have known that a detainee was entitled to release. But we have had only three occasions to consider such claims. See Fairley v. Luman, 281 F.3d 913, 915, 917-18 (9th Cir.2002) (per curiam); Lee, 250 F.3d at 677-78, 683-84; Oviatt v. Pearce, 954 F.2d 1470, 1473-77 (9th Cir.1992). In none of those cases did we suggest that physical differences between a detainee and the true subject of the warrant or lengthy detention without a court hearing were requirements to a successful due process claim. The examples cited by the majority are just that; they do not provide a basis for concluding that no other set of facts could sustain a detainee’s due process claim. Moreover, the majority creates a bright-line rule that jailers owe nothing to detainees whose claims of mistaken identity are “[ujnsupported.” Maj. Op. at 391-92. We have never suggested that a jailer’s duty to investigate is contingent on a detainee first presenting his jailer with supporting evidence. Nor can I see any logical basis for limiting a detainee’s due process rights to these circumstances. The touchstone is simply whether the jailer should have known, despite the existence of probable cause at the time of arrest, that a detainee was entitled to be released. This is inherently a fact-intensive, circumstance-specific inquiry.
The majority’s next conclusion — any duty the jailers have to investigate termi *395 nates once a detainee is held pursuant to a court order — is even less sound. See Maj. Op. at 392-93. The majority relies on several out-of-circuit cases to support its conclusion, see id. (citing Hernandez v. Sheahan, 455 F.3d 772, 776 (7th Cir.2006) and Lumbermens Mut. Cas. Co. v. Rhodes, 403 F.2d 2, 7 (10th Cir.1968)), but such a conclusion cannot be squared with our precedent. In Lee, the detainee, Kerry Sanders, who was mistakenly identified as the subject of a warrant from the State of New York, had an extradition hearing within one day of his arrest. 250 F.3d at 678, 684. At the hearing, after some dispute about the validity of Sanders’s Waiver of Extradition form, the court accepted the waiver. Id. at 678 n. 3. Subsequent to the hearing, Sanders, just like Rivera, was held pursuant to a court order until New York state officials took custody of him. See id.; CaLPenal Code § 1555.1 (If a waiver of extradition is executed, the “magistrate shall remand the person to custody without bail, unless otherwise stipulated by the district attorney with the concurrence of the other state.”). Nonetheless, in Lee, we specifically held that “[t]he argument that Kerry Sanders’s due process claim must fail at the pleading stage because he was incarcerated for only one day before his extradition hearing is ... unavailing.” 250 F.3d at 684. Under Lee, then, a detainee may still have a due process claim against his jailer despite a prompt court hearing that results in his remand to custody; the court order does not necessarily obviate a county’s obligation to investigate the validity of continued incarceration. Id.[1] The majority’s conclusion to the contrary is inconsistent with Lee.
Furthermore, exonerating a jailer of any obligation to investigate once a court remands a detainee to custody is an unsound policy. As this case demonstrates, if the detainee’s only recourse is to seek court intervention to verify his identity, he may languish in detention for weeks while the court searches its records for dated physical files. In contrast, county jail officials typically have instantaneous access to extensive criminal history records and fingerprint databases. It is no great burden to expect them to access these readily available resources when appropriate.[2],[3]
II.
The majority has imposed a variety of unjustified restrictions on Rivera’s Fourteenth Amendment claim. In determining *396 whether a violation occurred, the only inquiry is simply whether it “ ‘was or should have been known that the detainee was entitled to release.’ ” Lee, 250 F.3d at 683 (quoting Cannon, 1 F.3d at 1563). I would hold that here, Rivera’s complaints of mistaken identity, in conjunction with Los Angeles County’s failure to conduct any investigation or check readily available, exculpatory information, were sufficient to create a genuine, triable issue of fact as to whether the County should have known that he was entitled to be released.[4] See Baker v. McCollan, 443 U.S. 137, 148, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) (Blackmun, J., concurring) (“[DJeliberately and repeatedly refusing] to check the identity of a complaining prisoner against readily available mug shots and fingerprints” “might prove a due process violation.”); Russo v. City of Bridgeport, 479 F.3d 196, 201, 208 (2d Cir.2007) (holding that a detainee is protected from “a sustained detention stemming directly from the law enforcement officials’ refusal to investigate available exculpatory evidence” and allowing an action under 42 U.S.C. § 1983 against the jailers to proceed even though the detainee had numerous court appearances during his detention).[5]
Rivera testified that, upon arriving at the Los Angeles County jail, he complained to two Los Angeles County officials that he was not the individual wanted in the warrant. First, he informed a male official behind a window that he was “being mistaken for another person.” The male official wrote something down and directed Rivera to “[g]o to the cell.” He took no further action. Rivera also informed another official, a young woman behind a window, that “they were confusing me with a person who had run over two people here in Culver City.” The woman responded by saying “I’m sorry,” but also took no further action. In my view, a factfinder could reasonably conclude that such complaints were sufficient to put an officer or county official on notice that further investigation was necessary.[6]
Had either officer followed up with Rivera or conducted an independent investigation, the officer would have discovered— with relative ease — that Rivera was not the true subject of the warrant. A Los Angeles County official could have searched the California Law Enforcement Telecommunications System (“CLETS”), a statewide criminal records database maintained by the California Department of *397 Justice. CLETS would have returned two hits with distinct criminal information and identification (“CII”) numbers. Although the record contains some evidence that, occasionally, the same individual may be associated with two CII numbers, as a general matter, CII numbers are unique identifiers; two distinct CII numbers, then, would have alerted the officer to the fact that there was likely at least one other person who shared the warrant subject’s name and birthdate. The officer could have then run the two CII numbers through CLETS, and received two distinct criminal history reports. One report would have included a 1985 arrest for involuntary manslaughter, and the other would not have. Even more critically, the reports would have indicated that one of the individuals had previously been exonerated of the very charges for which Rivera was detained. The official would have then had good reason to believe that the CII numbers belonged to two different individuals. The official could have confirmed this by running the two CII numbers through the Automated Fingerprint Identification System (“AFIS”), which would have returned two distinct sets of fingerprints. By comparing Rivera’s fingerprints to the fingerprints associated with both CII numbers, the officer then could have determined that Rivera was the individual who had previously been exonerated of the charges, and not the true subject of the warrant. When the failure to take these simple steps results in a month-long detention of a man who twice alerted officials that he had been mistaken for another individual, a factfinder could reasonably conclude that a due process violation occurred.
III.
Even if a factfinder were to conclude that Los Angeles County officials violated Rivera’s due process rights, the inquiry would not end there. A municipality is liable for constitutional violations only where its policies or customs “evince a ‘deliberate indifference’ to the constitutional right and are the ‘moving force behind the constitutional violation.’ ” Edgerly v. City and Cnty. of San Francisco, 599 F.3d 946, 960 (9th Cir.2010) (quoting Levine v. City of Alameda, 525 F.3d 903, 907 (9th Cir.2008)).
Rivera contends that Los Angeles County has a policy of relying on the arresting agency’s identification. Los Angeles County does not dispute that, as a general matter, it does not verify the identity of individuals arrested by a different agency; however, if an individual arrested by a different agency complains that he is not the subject of the warrant, Los Angeles County will conduct an investigation. Rivera has not shown how the failure to conduct an investigation at the outset for every person arrested by another agency is deliberately indifferent to a detainee’s constitutional rights.
On the evidence presented, however, a factfinder may nonetheless conclude that Los Angeles County’s policy is deliberately indifferent to a detainee’s due process rights and was the moving force behind the violation. Sergeant Angela Becerra, the Document Control Sergeant at the Inmate Reception Center of the Los Angeles County jail, described the County’s policy as follows: When a detainee complains that “he is not the subject of a warrant on which he has been arrested or detained,” officials fill out a Disputed Warrant Verification Form and begin an investigation. They compare the detainee’s and the warrant subject’s physical characteristics, dates of birth, CII numbers, and, if necessary, criminal histories. However, Agent Becerra’s declaration also states that this is a rare complaint, noting that many inmates will complain “that they are ‘innocent’, that they were arrested by ‘mistake,’ or that they are not the person the police *398 are looking for,” but not that they had been “misidentified with a warrant.”
A factfinder could reasonably conclude from the above that Los Angeles County has a policy of investigating only those complaints of misidentification that have been phrased in very precise, particular terms. Applying the Disputed Warrant Verification Form procedures only when a detainee specifically complains that he is not the subject of the warrant and ignoring the other, more common complaints may well be deliberately indifferent to a detainee’s constitutional rights. After all, a lay person has no means of knowing that, to get an officer’s or county official’s attention, he must state, in very specific terms, that he is not the true subject of the warrant; instead, he may reasonably attempt to explain his predicament by indicating that the police have mistaken him for another person or that he is not the person the police are seeking. It is entirely obvious that refusing to investigate any but the most precise misidentification complaints will lead to the unconstitutional detention of innocent individuals. See Lee, 250 F.3d at 682 (“[Djeliberate indifference to a person’s constitutional rights occurs when the need for more or different action, ‘is so obvious, and the inadequacy [of the current procedure] so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need.’ ” (second alteration in original) (quoting Oviatt, 954 F.2d at 1477-78)).
If the factfinder were to conclude that Los Angeles County has a policy of investigating only a narrow set of very precisely-worded complaints, the factfinder could also reasonably conclude that this policy was the moving force behind the deprivation of Rivera’s rights. In order to be the “moving force” behind a plaintiffs injury, the “ ‘identified deficiency’ in the County’s policies [must be] ‘closely related to the ultimate injury.’” Gibson v. Cnty. of Washoe, Nev., 290 F.3d 1175, 1196 (9th Cir.2002) (quoting City of Canton v. Harris, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Here, the statements Rivera made to the Los Angeles County officials are remarkably similar to Agent Becerra’s examples of complaints that would be considered distinct from general misidentification claims. A factfinder could reasonably determine that Rivera’s complaints were therefore ignored because of a municipal policy to not investigate such complaints.
IV.
For the above reasons, I would hold that a genuine issue of material fact exists as to whether Rivera’s due process rights were violated and whether Los Angeles County may be held liable for the violation. I would therefore affirm in part and reverse in part the district court’s order granting summary judgment in favor of Defendants.

. The majority reads Lee as permitting liability for only the pre-hearing detention. Maj. Op. at 392 n. 5. Lee specifically contemplates that the defendants might be liable for “Sanders’s two-year incarceration," not the one-day pre-hearing detention. Lee, 250 F.3d at 685. Indeed, Lee holds that certain New York state officials may be held accountable for Sanders's detention, and those officials only became involved in Sanders’s case after the extradition hearing. Id. at 678, 695.

. This does not mean that jailers have a constitutional duty to scour readily available databases for exculpatory information any time a detainee claims that he is innocent, and I do not contend otherwise. Contra Maj. Op. at 391-92 n. 4. Here, it is the failure to conduct any investigation in response to Rivera’s complaints of mistaken identity that creates a genuine issue of fact as to whether Los Ange-les County should have known that Rivera was entitled to be released. See Dissent at 395-96. If a constitutional obligation can be inferred from the holding I would adopt, it is that jailers must implement investigatory procedures to handle complaints of mistaken identity.

.Los Angeles County contends that once a detainee is held pursuant to a court order, jailers lack the discretion to release him. Even so, this would not prevent jailers from investigating and informing the detainee, the prosecutor, defense counsel, and the court, of any determination that the detainee is not the true subject of the warrant.

. I do not address whether San Bernardino County officials should have known that Rivera was entitled to be released. Even assuming that San Bernardino County officers should have known that Rivera was entitled to be released, Rivera has offered no evidence of a municipal policy or custom that was deliberately indifferent to complaints of mis-identification. Rivera only argues that San Bernardino County does not require "positive identification accomplished through the exchange of fingerprint facsimiles.” But the failure to access fingerprint databases for every individual arrested or detained does not evince deliberate indifference to any constitutional right.

. The majority’s attempt to distinguish Russo on the ground that it is a Fourth Amendment case is unpersuasive. See Maj. Op. at 392-93 n. 6. The claim in Russo is the same claim we are faced with here. In the Second Circuit's view, recent Supreme Court case law has suggested that the source of the right first recognized in Baker is the Fourth Amendment rather than the Fourteenth Amendment; consequently, it analyzes Russo’s claim under the Fourth Amendment. Russo, 479 F.3d at 208. The Fourth Amendment claim discussed in the relevant portion of Russo is not, as the majority wrongly insinuates, an unlawful arrest claim. See id. at 205, 208.

.The majority dismisses these complaints as "brief” and "casual,” see Maj. Op. at 391-92, but it is the factfinder's role to assess whether Rivera's pleas that he was being mistaken for another individual should have prompted some action.