Fernando LUPINACCI, Plaintiff

v.

Martin PIZIGHELLI, et al., Defendants.

Civil Action No. 3:06–CV–1308 (JCH).

United States District Court, D. Connecticut.

March 31, 2008.

---

1. In this case, the occupants of the Subaru were young Hispanic males.

Thomas J. Weihing, Daly, Weihing & Bochanis, Bridgeport, CT, for Plaintiff.

Barbara Brazzel–Massaro, City of Bridgeport, Office of the City Attorney, Bridgeport, CT, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### [Doc. No. 29]

JANET C. HALL, District Judge.

Plaintiff Fernando Lupinacci brings this Section 1983 action against the City of Bridgeport, and several Bridgeport police officers, for events arising out of his arrest on July 25, 2004. Lupinacci alleges that defendants Martin Pizighelli and Ryan Frechette, along with several other officers, wrongfully and violently arrested him in violation of his constitutional rights. The defendants have moved for summary judgment. *See* Doc. No. 29. For the reasons that follow, the court **GRANTS** the motion **IN PART** and **DENIES** the motion **IN PART.**

## I. STANDARD OF REVIEW

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). Once the moving party has met its burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in his favor in order to defeat the motion. *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party."

*Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir.2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

## II. FACTUAL BACKGROUND

The circumstances surrounding Lupinacci's arrest are hotly contested. However, taking the evidence in the light most favorable to the plaintiff, the facts are as follows.

On July 25, 2004, at around 7:15 pm, there was a disturbance in the City of Bridgeport in the area of Madison and Garfield Avenues. The disturbance resulted from celebrations surrounding a victory by the Brazilian soccer team in an international competition. Several individuals were arrested, and the disturbance quieted down. However, Bridgeport Police Sgt. Raymond Masek thought it would be prudent to maintain a police presence in the area to prevent future disturbances, and so he ordered a number of officers to the scene, including Pizighelli, Frechette, Officer Brian Pisanelli, K–9 Officer Morales, and Officer Pascone. By 9:00 pm, there were approximately thirty officers in the general area, some on foot and some in patrol cars.

At approximately 9:00 pm, Lupinacci and some relatives went to get ice cream at a store at the corner of Garfield and Madison. Lupinacci Aff. at ¶¶ 4–5. As they sat outside the store eating ice cream, someone nearby yelled, "fight." *Id.* at ¶ 6. Officers Pizighelli, Morales, Frechette, and Pascone responded to the scene immediately. Lupinacci also got up and walked towards where he saw three individuals yelling at each other. *Id.* ¶ 6.

According to Lupinacci, two of the officers then forcibly subdued two of the individuals who were arguing, as a crowd of people (including Lupinacci) observed their actions. *Id.* ¶ 7. The third individual was also arrested. *Id.* ¶ 8. Pizighelli then told the small crowd to go home, and the crowd complied, including Lupinacci. *Id.* For reasons that are not entirely clear, however, Pizighelli began following the crowd and yelled profanities at them. *Id.* Lupinacci turned around and told Pizighelli that there was no reason for that type of language. *Id.* Pizighelli responded with a "fuck you," at which point Lupinacci asked the officer for his badge number. *Id.* Pizighelli then tackled Lupinacci to the ground and arrested him, with the assistance of a second officer. *Id.*

According to Lupinacci, at no time during these events did he invade Pizighelli's personal space, nor did he at any time yell or scream. *Id.* ¶ 11. He also maintains that he never physically resisted his arrest. *Id.* ¶ 10.

Lupinacci was charged with three crimes: breach of peace, inciting to riot, and interfering with a police officer. These charges were subsequently nolled in state court. *Id.* ¶ 9. The state court prosecutor told Lupinacci that he was simply an innocent bystander; Lupinacci did not have to do any community service or pay any fine. Lupinacci Dep. at 36.

At the time of Lupinacci's arrest, Sgt. Masek was a supervisor in the Bridgeport Police Department, and he was responsible for overseeing approximately 12–15 officers, including many of the officers involved in the July 25 incident. Sgt. Masek was not directly present at the scene when Lupinacci was arrested, as he was responding to a domestic violence incident in a nearby area. Masek Dep. at 16. He did drive to the scene a bit later that night, sometime between 9:30 and 10:30, but at the time he drove by there were no more officers there, and everyone had dispersed. *Id.* at 32.

On July 25, 2004, Lupinacci filed a Complaint in state court, naming as defendants officers Pizighelli, Frechette, and Pisanelli, Sgt. Masek, the City of Bridgeport, and the City of Bridgeport Police Department. *See* Doc. No. 1, Exh. 1, at 1–2. Under 42 U.S.C. § 1983, Lupinacci asserted two claims: first, that he was falsely arrested in violation of the federal constitution, and second, that his arrest violated the federal constitution because it was done with excessive force. Compl. at 1–2.[1] Additionally, Lupinacci brought a claim against the City of Bridgeport under Conn. Gen.Stat. § 7–465, in which he sought damages from the municipality for actions caused by municipal employees. *Id.* at 4. Lupinacci also appears to have asserted a claim for false arrest under state law.[2] *Id.* at 2.

All of the defendants filed what they termed a "Motion for Summary Judgment." However, the defendants' Motion made no mention of Lupinacci's claim un-

---

1. Lupinacci's Complaint is extremely ambiguous about the specific constitutional claims he is asserting. In his opposition to summary judgment, however, Lupinacci appears to contend that he has only brought two claims: a false arrest claim, and an excessive force claim. *See* Doc. No. 38 at 1. The court therefore interprets plaintiff's Complaint as stating only these two substantive causes of action.

2. The Complaint also vaguely asserted that the defendant officers deprived Lupinacci of rights secured by the Constitution and laws of Connecticut, though it is not clear from the Complaint what specific claims Lupinacci was alleging under state law. Lupinacci's memorandum in opposition appears to contemplate, however, that his sole substantive state law claim was for false arrest. Plaintiff's Obj. at 4, 13. The court will treat the Complaint as such.

der Conn. Gen.Stat. § 7–465, and thus the defendants' motion is better understood as a motion for partial summary judgment.

## III. ANALYSIS

The Fourth Amendment protects individuals from unreasonable searches and seizures. In a Section 1983 action for false arrest, the main question is whether or not the arresting officer had probable cause. *See Jaegly v. Couch,* 439 F.3d 149, 151–52 (2d Cir.2006). Under both Connecticut and federal law, probable cause exists when an officer has knowledge of sufficient facts and circumstances to warrant a reasonable officer in believing that the arrestee has committed or is committing a crime. *Walczyk v. Rio,* 496 F.3d 139, 156 (2d Cir.2007) (citing federal and Connecticut cases).[3] While the probable cause standard is not as strong as the familiar "preponderance of the evidence" standard, it is more than a mere suspicion. *Id.* Additionally, the test is an objective one that only asks whether the arresting officer had probable cause to arrest the suspect for any crime. *Jaegly,* 439 F.3d at 153–54. A reviewing court must generally examine the facts, in light of state criminal law, to see if there was probable cause for arrest. *See id.* at 152–53.

The Fourth Amendment also prohibits officers from using excessive force when arresting criminal suspects. The test for determining excessive force requires the court to balance the extent of the force used against the countervailing government interests at stake. *Graham v. Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). This is an objective reasonableness test, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Because this a Section 1983 action, however, the claims against the individual officers implicate the further doctrine of qualified immunity. Thus, even if the individual officers committed constitutional violations, they are still entitled to judgment in their favor if they did not violate clearly established rights, about which a reasonable officer would have known. *Jones v. Parmley,* 465 F.3d 46, 55 (2d Cir.2006). In the false arrest context, this means that the arresting officer will escape liability if a reasonable police officer, acting in the same circumstances and with the same knowledge as possessed by the section 1983 defendant, could have reasonably believed that probable cause existed. *Zellner v. Summerlin,* 494 F.3d 344, 369 (2d Cir.2007); *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997). And in the excessive force context, qualified immunity adds the "further dimension" that police officers will be protected when there is a lack of clarity as to the proper application of legal doctrine to the facts at hand. *Saucier v. Katz,* 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Cowan v. Breen,* 352 F.3d 756, 761 (2d Cir.2003).

### A. *Officer Pizighelli*

Turning first to the false arrest claim, Pizighelli argues that his arrest was justified because there was probable cause to believe that Lupinacci had committed three crimes: breach of the peace, *see* Conn. Gen.Stat. § 53a–181, interfering with an officer, *see id.* § 53a–167a, and inciting to riot, *see id.* § 53a–178.

---

**3.** The Second Circuit has treated Connecticut and federal law governing false arrest claims as largely overlapping, *see, e.g., Davis v. Rodriguez,* 364 F.3d 424, 433–34 (2d Cir.2004), and no party has identified any aspect of Connecticut false arrest law that would differ from federal law. The court will treat both claims for false arrest in the same manner.

Under Connecticut law, an individual is guilty of breach of the peace when:

with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; or (3) threatens to commit any crime against another person or such other person's property; or (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person; or (5) in a public place, uses abusive or obscene language or makes an obscene gesture; or (6) creates a public and hazardous or physically offensive condition by any act which such person is not licensed or privileged to do.

*Id.* § 53a–181. An individual is guilty of interfering with an officer when "such person obstructs, resists, hinders or endangers any peace officer . . . in the performance of such peace officer's . . . duties." *Id.* § 53a–167a. Finally, an individual is guilty of inciting to riot when "he advocates, urges or organizes six or more persons to engage in tumultuous and violent conduct of a kind likely to cause public alarm." *Id.* § 53a–178.

Taking the facts in the light most favorable to Lupinacci, it is plain that a reasonable officer in Pizighelli's position could not have believed that Lupinacci had committed any of these crimes (or any crime at all). Pizighelli is not entitled to summary judgment on the false arrest claim.

▮ Pizighelli nonetheless asserts that Lupinacci cannot maintain his false arrest claim because his state court criminal charges were nolled. *See Roesch v. Otarola,* 980 F.2d 850, 853 (2d Cir.1992) (stating that a § 1983 defendant must obtain a

favorable termination on the merits of the underlying criminal proceeding in order to bring a false arrest claim). There is a split of authority in this district regarding the effect of a nolle on a subsequent Section 1983 claim for false arrest. *See Russo v. City of Bridgeport,* 479 F.3d 196, 204 n. 9 (2d Cir.2007) (citing cases, and noting that the Second Circuit has yet to resolve this issue). However, while some cases appear to apply a *per se* bar against maintaining a false arrest claim following a nolle, *see, e.g., Birdsall v. City of Hartford,* 249 F.Supp.2d 163, 171 (D.Conn.2003), the court concludes that the better view is to require a more nuanced approach. In some circumstances, a nolle is really just an abandonment of prosecution that is not conditioned on the defendant "giving up" anything. *See Holman v. Cascio,* 390 F.Supp.2d 120, 123 (D.Conn.2005). And in those circumstances in which the prosecution has simply given up, the policy concerns that normally justify barring a Section 1983 suit are not present. *Cf. Roesch,* 980 F.2d at 852 (explaining that it is important not to discourage state prosecutors from dismissing charges in exchange for the defendant's participation in a pretrial rehabilitation program).

Accordingly, on summary judgment, this court must determine whether Lupinacci's nolle was obtained "as part of a plea bargain or under other circumstances that indicate that the defendant received the nolle in exchange for providing something of benefit to the state or victim." *Holman,* 390 F.Supp.2d at 124. Lupinacci has presented evidence to pass that test, as his deposition testimony was that the prosecutor declared him "an innocent bystander," and that he did not have to pay any fine or perform community service as a condition of the nolle.[4]

---

4. It bears noting that the defendants have provided no evidence to the contrary.

■ Turning next to the excessive force claim, there can be no dispute that Pizighelli is not entitled to summary judgment on this record. Here, a jury could conclude that Lupinacci was simply standing on the sidewalk, that he was a reasonable distance from Pizighelli, that he did not pose any threat to Pizighelli, and that he in no way resisted arrest. In those circumstances, an objective officer would not think it reasonable to tackle an individual to the sidewalk, without in any way first asking the individual to voluntarily submit to an arrest. Indeed, Sgt. Masek testified that an officer is generally only justified in using physical force to effect an arrest after the subject refuses to be arrested. Masek Dep. at 30–31.

### B. Officers Frechette and Pisanelli

■ Frechette and Pisanelli argue that they cannot be liable for false arrest or excessive force because there is no evidence that they arrested or tackled Lupinacci. They point out that a defendant cannot be held liable under Section 1983 unless that defendant was personally involved in the deprivation of the plaintiff's constitutional rights. See, e.g., Farrell v. Burke, 449 F.3d 470, 484 (2d Cir.2006).

Lupinacci suggests that Frechette was the second arresting officer on the scene, and that he was therefore personally involved. Plaintiff's Obj. at 7. However, Lupinacci does not have any evidence to support this assertion. Frechette denied any involvement in the arrest, see Frechette Dep. at 28, 40, and Pizighelli was unable to remember which officer had assisted him, see Pizighelli Dep. at 24. Lupinacci also could not identify the second officer.

It is true that both Frechette and Pizighelli placed their names at the bottom of the police report detailing the circumstances of Lupinacci's arrest. Plaintiff's Exh. B at 7. However, Lupinacci does not dispute that the report was actually written by Pizighelli, see Plaintiff's Obj. at 7, and the report does not state that Frechette had any involvement in Lupinacci's arrest. Plaintiff's Exh. B at 7. Lupinacci provides no evidence to dispute Frechette's testimony that because he and Pizighelli were partners and worked out of the same police car, they always put both their names on their police reports, with the officer actually writing the report putting his name first. See Frechette Dep. at 36–37. It is undisputed that there were a number of officers in the immediate vicinity of Pizighelli; the mere fact that Frechette's name was on Pizighelli's police report therefore does not allow a reasonable jury to conclude that Frechette was the second officer on the scene.[5]

■ Lupinacci also argues that Frechette and Pisanelli are liable for their failure to intercede and prevent excessive force from being used in his arrest. The Second Circuit has held that a law enforcement officer has an affirmative duty "to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir.1988). However, the plaintiff must show that a defendant's failure to intercede was a proximate cause of the injuries he sustained. See id. Accordingly, if a defendant has no "realistic opportunity to attempt to prevent" a constitutional viola-

---

5. Lupinacci also attempts to rely on Masek's deposition testimony. See Plaintiff's Obj. at 7. However, Masek's testimony was that, based only on looking at the police report, "I believe Officer Frechette was the assisting officer at the scene at that time. I'm not really clear as to what role he played." Masek Dep. at 37 (emphasis added). Accordingly, while Masek could determine that Frechette was present while Lupinacci was being arrested, Masek was unable to determine if Frechette was the second arresting officer.

tion, that defendant cannot be liable. *Id.* Here, if the plaintiffs' version of the facts is credited, Pizighelli and another officer tackled and arrested him suddenly and without warning. While Frechette and Pisanelli may have been nearby, there is no evidence that any constitutional violations were of sufficient duration that these officers could have interceded in a timely manner. Accordingly, summary judgment must be granted to Frechette and Pisanelli.

### C. *Sgt. Masek*

■ Sgt. Masek contends that he is entitled to summary judgment because there is no evidence that he too was personally involved in Lupinacci's arrest. Lupinacci, however, argues that Masek is liable in his supervisory capacity.[6]

■ Generally, "[a] supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002) (citing *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir. 1999)). However, a supervisor may be found to be liable for a subordinate's action when he (1) directly participated in the action; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue;" or (4) "was grossly negligent in managing subordinates who caused the unlawful condition or event." *Williams v. Smith,* 781 F.2d 319, 323–4 (2d Cir.1986).

Lupinacci claims that Masek is liable under the fourth prong, because he was "grossly negligent" in his supervision.

Plaintiff's Obj. at 8. Lupinacci notes that Masek was not physically present at the scene, did not question the officers' use of force based on the police reports, and did not specifically oversee the events that took place when Lupinacci was arrested.

■ A supervisor is grossly negligent or deliberately indifferent when he "knew or should have known" that there was a high degree of risk that a subordinate would violate someone's rights but "either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury." *Poe,* 282 F.3d at 142; *see also Provost v. City of Newburgh,* 262 F.3d 146, 155 (stating that there can be no liability for gross negligence absent evidence that a supervisor "knew or should have known" about an illegality).

There is absolutely no evidence that Masek knew or should have known that Pizighelli was likely to engage in this kind of behavior. Nor is there any evidence that Masek knew or should have known that he needed to be physically present beside his subordinate officers at all times during the night. And because the police report contains a version of the facts that is drastically different from Lupinacci's version, and shows Lupinacci to have resisted arrest and engaged in criminal behavior, there is no evidence that Masek knew or should have known that the circumstances of the arrest were actually as Lupinacci has described them.

In short, Lupinacci's argument really just amounts to a claim that a police supervisor commits "gross negligence" in super-

---

**6.** Lupinacci also suggests that Masek is directly liable for his failure to intervene. However, there is no evidence that Masek was immediately present at the scene at the time of Lupinacci's arrest, and Masek therefore did not have a realistic opportunity to directly prevent the violation.

vision when he delegates tasks to a subordinate. Without more, such a claim is unsustainable.

### D. City of Bridgeport

■ Lupinacci also seeks to hold the City of Bridgeport liable under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Under *Monell* and its progeny, a city cannot be held liable in a Section 1983 claim under a *respondeat superior* theory. *Id.* at 663 n. 7, 98 S.Ct. 2018. The "touchstone" of liability is whether or not the "municipality itself caused or is implicated in the constitutional violation." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir.2004). A plaintiff must establish that the municipality has a "policy" or "custom" that can be said to have caused the plaintiff's injury. *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

■ Lupinacci argues that the city has an unwritten policy or custom of condoning civil rights violations by Bridgeport police officers. *See* Plaintiff's Obj. at 19. However, the sole evidence Lupinacci offers to support this claim is the fact that there were several federal cases, all of which occurred before 1984, in which Bridgeport police officers were found liable for excessive force or other civil rights violations and the city did not take corrective action. *See id.* at 19–20. However, these violations are so remote in time from the events at issue here that no reasonable jury could conclude that they reflected the municipality's policy at the time of Lupinacci's arrest.[7] *Cf. Brown*, 520 U.S. at 407, 117 S.Ct. 1382 (explaining that a municipality's *continued* adherence to an inadequate program could be sufficient to establish municipal liability).

■ Lupinacci attempts to bolster his claim by pointing out that Officer Pizighelli was not disciplined for the events in this case, which therefore shows the City's policy of not disciplining officers who commit civil rights violations. However, as discussed above with respect to Sgt. Masek, there is absolutely no evidence that any individual with supervisory authority over Pizighelli knew that the circumstances of Lupinacci's arrest were actually as Lupinacci had described them. *Cf. Amnesty Am.*, 361 F.3d at 128 (explaining that when the plaintiff proceeds on a theory of failure to supervise, the plaintiff at a minimum needs to establish that "a policymaking official had notice of a potentially serious problem of unconstitutional conduct" and that "the policymaker's failure to investigate or rectify the situation evidences deliberate indifference, rather than mere negligence or bureaucratic inaction").

■ Finally, to the extent that plaintiff is alleging that the City has failed to train its employees, his claim fails because he has not introduced any evidence about the actual training utilized by the City, nor has he identified any particular inadequacies in the City's training program. *See id.* at 129–30.

The City of Bridgeport is therefore entitled to summary judgment on the *Monell* claim against it.[8]

---

7. Indeed, the fact that plaintiff has found no incidents more recent than 1984 leads to the opposite inference.

8. Plaintiff's *Monell* claim also names the Bridgeport Police Department as a separate defendant. Defendants contend that the Bridgeport Police Department is not a separate legal entity from the City, and the plaintiffs do not make any mention of the Bridgeport Police Department in opposing the defendants' summary judgment motion. Accordingly, because the City is entitled to judgment on the *Monell* claim, the court

## IV. CONCLUSION

The defendants' Motion for Summary Judgment [Doc. No. 29] is **GRANTED IN PART** and **DENIED IN PART**. The motion is denied as to Pizighelli, and granted as to all other defendants. Because the defendants did not move for summary judgment on the plaintiff's state law claim for indemnification by the City, and because Pizighelli remains in the case, the City of Bridgeport shall remain a defendant in this action.

**SO ORDERED.**

concludes that its police department is similarly entitled to judgment on that claim.