FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY TATUM,
                    *Plaintiff-Appellee,*

STEVEN MOODY, LAPD Detective;
ROBERT PULIDO, LAPD Detective,
                    *Defendants-Appellants.*

No. 10-55692

D.C. No.
2:08-cv-04707-
PJW

---

MARY TATUM,
                    *Plaintiff-Appellee,*

v.

STEVEN MOODY, LAPD Detective;
ROBERT PULIDO, LAPD Detective,
                    *Defendants-Appellants.*

No. 10-55970

D.C. No.
2:08-cv-04707-
PJW

OPINION

Appeal from the United States District Court
for the Central District of California
Patrick J. Walsh, Magistrate Judge, Presiding

Argued and Submitted
March 9, 2012—Pasadena, California

Filed September 17, 2014

Before: Kim McLane Wardlaw and Marsha S. Berzon, Circuit Judges, and Ronald M. Whyte, Senior District Judge.[*]

Opinion by Judge Berzon

---

**SUMMARY**[**]

---

**Civil Rights**

The panel affirmed the district court's judgment, entered following a jury verdict in favor of plaintiff, in an action brought pursuant to 42 U.S.C. § 1983 alleging that Los Angeles Police Department detectives failed to disclose compelling exculpatory evidence to the prosecutor while plaintiff was incarcerated pretrial, and did so with deliberate indifference to, or reckless regard for, the truth or plaintiff's rights.

Plaintiff was incarcerated for 27 months pending trial on charges arising from a series of demand-note robberies. The charges were dismissed after plaintiff's defense counsel obtained exculpatory material which defendants failed to disclose. The panel held that plaintiff's claim was covered by the Fourteenth Amendment's guarantee of due process, and

---

[*] The Honorable Ronald M. Whyte, Senior District Judge for the U.S. District Court for the Northern District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

not by the Fourth Amendment. The panel held that the Constitution protects a plaintiff from prolonged detention when the police, with deliberate indifference to or in the face of a perceived risk that their actions will violate the plaintiff's right to be free of unjustified pretrial detention, withhold from the prosecutors information strongly indicative of his innocence. The panel held that the jury's determination that defendants acted with deliberate indifference or reckless disregard for plaintiff's rights satisfied the standard applicable to violations of due process and that the jury instructions described a cognizable constitutional claim. Because the panel affirmed the district court's judgment, it likewise affirmed the award of fees to plaintiff, as the prevailing party.

## COUNSEL

Amy Jo Field (argued), Deputy City Attorney; Carmen A. Trutanich, City Attorney, Los Angeles, California, for Defendants-Appellants.

John Burton (argued), Law Offices of John Burton, Pasadena, California; Maria Cavalluzzi, Cavalluzzi & Cavalluzzi, West Hollywood, California, for Plaintiff-Appellee.

**OPINION**

BERZON, Circuit Judge:

A jury found Los Angeles Police Department ("LAPD") detectives Steven Moody and Robert Pulido liable under 42 U.S.C. § 1983 for violating Michael Walker's constitutional rights by (1) acting with deliberate indifference to, or reckless disregard for, Walker's rights or for the truth, in (2) withholding or concealing evidence that (3) strongly indicated Walker's innocence of the crimes for which he was held, and was reasonably likely to have resulted in dismissal of the charges against him if revealed. Indeed, dismissal of the charges is exactly what happened when Walker's defense counsel finally obtained the exculpatory material, after Walker had endured pretrial incarceration for over two years.

Walker, now deceased, was incarcerated pending trial on charges arising from a series of demand-note robberies of small retail businesses in Los Angeles. Detectives Moody and Pulido were responsible for investigating the crimes. They knew, before Walker was bound over for trial, that additional demand-note robberies, perpetrated with the same distinctive modus operandi as those for which Walker was being held, had occurred in the same part of Los Angeles after Walker was in police custody. Pulido also knew that another man, Stanley Smith, had confessed to some of those later crimes after Walker's arrest. The spate of demand-note robberies in fact ended only upon Smith's apprehension.

Moody and Pulido never disclosed any of this information—not the continuing crime spree, not the similarities of those continuing crimes to the crime for which Walker was being detained, not Smith's arrest, and not

Smith's confession—to the prosecutor pursuing the case against Walker. Instead, the two officers falsely asserted in police reports written by Moody and approved by Pulido that the "crime spree caused by the 'Demand Note Robber'" ceased with Walker's arrest. When, twenty-seven months of pretrial detention and repeated discovery requests later, Walker's defense attorneys finally learned of Smith's arrest and conviction, Smith's fingerprints were matched to those found at the scene of one of the robberies attributed to Walker. As soon as the prosecutor was made aware of this evidence, he dropped the charges against Walker. A California court thereafter declared him factually innocent, but only after he had been deprived of his liberty for over two years.

In this 42 U.S.C. § 1983 action, the jury found that Moody and Pulido failed to disclose this compelling exculpatory evidence to the prosecutor, and did so with deliberate indifference to, or reckless regard for, the truth or for Walker's rights. We affirm.

# I.

## A.  The Southwest Division investigation

Between June 27 and August 15, 2005, the Southwest Division of the Los Angeles Police Department ("LAPD") received reports of thirteen "demand-note" robberies. In each robbery, the perpetrator entered a small business and presented a handwritten note demanding money from the cashier.

During this period, Pulido supervised the "robbery table" at the Southwest Division. Pulido, Moody's direct

supervisor, assigned him to investigate the thirteen demand-note robberies that had been reported at that time.

By the time the sixth demand-note robbery was reported, Moody and Pulido began to suspect that the robberies were being committed by a single individual. Until the recent spree, demand-note robberies had been rare in the area. Each of these recent robberies, however, followed the same script: the robber, who appeared to be working alone, would enter a business posing as a customer; present a note to the cashier demanding money, sometimes threatening violence or displaying what looked like a firearm; take cash; and then flee on foot. Although the precise language of the demand notes varied from one robbery to the next, the messages were similar. The suspect in each of the robberies also shared a general physical description: "male black, black hair, brown eyes, 5'6" to 5'7", 160 to 180 pounds, age varying from 25 to 45."

On August 13, the twelfth demand-note robbery in the Southwest Division occurred at an EB Games store. The thirteenth occurred two days later at a nearby Blockbuster. On August 16, Walker went to EB Games and was arrested after employees identified him as the perpetrator of the robbery three days before. Police took Walker to the Southwest station, where they determined that he did not have a demand note on him. After agreeing to speak to Moody and waiving his *Miranda* rights, Walker maintained that he did not have any involvement in the EB Games robbery and consented to a search of the apartment where he stored his personal property. Moody conducted the search but found no evidence of the crime or any other robbery.

Nonetheless, Moody and Pulido concluded almost immediately that Walker had committed all thirteen demand-note robberies that had then been reported to the Southwest Division. Just two days later, however, events transpired that should have led them to reconsider that theory: someone attempted to rob the Golden Bird, a restaurant in the Southwest Division, with a demand note. The description of the perpetrator of this crime matched that of the suspect who had committed the previous thirteen robberies, and the modus operandi was the same.

When Pulido learned of the attempted robbery at the Golden Bird, he assigned the case to Moody for investigation. Moody was "surprised" to hear about this incident; the first thing that came to his mind when he read the report of the incident was that the Golden Bird robber might be the same suspect that had committed the previous robberies. Moody discussed this theory with Pulido, who also expressed surprise that another, similar robbery had occurred in the same area, even though they had a suspect in custody.

That same day, yet another demand-note robbery occurred at a different location in the Southwest Division, a Burger King restaurant. Pulido assigned investigative responsibility for that robbery to an officer other than Moody; that officer issued a crime alert. As Pulido later testified, Moody "should have" seen the crime alert in the normal course of business.[1]

---

[1] While under oath during a discovery hearing on October 22, 2007, Moody stated that he had learned of the Burger King robbery on the same day that he learned about the attempted robbery at the Golden Bird. He also stated that he was responsible for investigating the Burger King robbery. At trial, however, Moody testified that he did not know about the Burger King robbery in its immediate aftermath. When confronted with the discrepancy between that statement and his testimony at the discovery

Pulido also testified at trial that, within days of Walker's arrest, he was aware of "the Burger King robber and the Golden Bird robber, who had the same general descriptions and the same MO [as the person] . . . committing demand-note robberies."

## B. The Robbery Homicide Division investigation

During this same period, detectives Freddy Arroyo and Brett Richards were investigating a series of demand-note robberies, beginning with one that occurred on June 30, 2005. Arroyo and Richards were assigned to the Robbery Homicide Division ("RHD") of the LAPD, a specialized unit whose investigative responsibility covered the entire city. The RHD demand-note robberies shared a similar suspect description with those being investigated by the Southwest Division. The suspect was generally described as a "[m]ale black, 35 to 40 years old, . . . thin to medium build." The modus operandi for these robberies was also similar to those in the Southwest Division: the suspect would present a demand note to the cashier and sometimes simulate a handgun and threaten to shoot the victim.

Arroyo was assigned to the South Bureau of the RHD, which includes the Southwest Division. While investigating the demand-note robberies in the South Bureau, Arroyo generally spoke to Pulido at least once a week. Pulido knew about the RHD's investigation of demand-note robberies by the end of August. And during the end of August and beginning of September, Arroyo and Pulido spoke "almost on

_____

hearing, Moody acknowledged that he had formerly testified under oath to knowledge of the Burger King robbery, but that he had "testified in error."

a daily basis." Nevertheless, Arroyo testified at trial, he had no recollection of Pulido telling him that the Southwest Division had investigated a similar series of demand-note robberies that culminated in an arrest. Nor did Pulido notify the RHD about the attempted robbery of the Golden Bird when it occurred. He did, however, inform Arroyo about the Burger King robbery, which was then transferred to Arroyo for investigation.

On September 15, Stanley Smith was arrested while fleeing from a Blockbuster he had just robbed using a demand note. At trial, Arroyo did not recall whether Smith had specifically admitted involvement in any of the demand-note robberies in the Southwest Division that occurred before Walker's arrest. Nor does the record reveal whether Smith was ever asked about his potential involvement in those thirteen robberies. But Smith *did* confess to committing roughly two robberies per week, and specifically identified five of these robberies, including the Burger King robbery in the Southwest Division that occurred just days after Walker's arrest.

The spree of demand-note robberies in the Southwest Division ended with Smith's arrest. Based on Smith's modus operandi, Arroyo suspected that Smith was responsible for all the recent demand-note robberies. Smith was ultimately convicted of several of the robberies attributed to him.

Arroyo notified Pulido of Smith's arrest almost immediately. Although the RHD circulated a bulletin to all LAPD divisions regarding Smith's arrest, Moody testified that he did not see it.

## C. The criminal case against Walker

Neither Moody nor Pulido ever informed the prosecutors responsible for Walker's case about the August 19, 2005 Golden Bird and Burger King robberies. Instead, between August 18 and September 8, Moody conducted a number of photographic line-ups, in which four eyewitnesses identified Walker as the perpetrator of several of the demand-note robberies. Two of these identifications were less than certain: one witness identified Walker "because of the complexion" and qualified her answer by indicating, "[It] looks the most like him, but I'm not saying it's him, but looks like him." Another witness tagged Walker as the robber but noted a discrepancy between his photograph and her memory of the suspect: "The one that I think looks more [like the perpetrator] is [Walker]. The guy is the same . . . but he is shaven."

In late September—at which time Pulido both knew that demand-note robberies had continued in the area after Walker's arrest and also that RHD had arrested Smith for these later crimes—Moody drafted a report concerning his investigation of the EB Games robbery. Prosecutors routinely relied on such reports to make their charging decisions. That report, which Pulido approved, that Walker was under investigation for thirteen demand-note robberies in the Southwest Division. Moreover, the report stated the following in bold font: "**Since the arrest of Walker the crime spree caused by the 'Demand Note Robber' has ceased.**"

On October 25, at the prosecutor's request, Moody conducted a live line-up. Two of the four witnesses who had

identified Walker in the photographic line-up tagged him as the demand-note robber. The other two did not.

Moody prepared another follow-up report on November 11. That report repeated—verbatim, and again in bold type—the assertion that the demand-note robberies had ceased since Walker's arrest. Pulido approved this report as well.

Walker had his first preliminary hearing, for charges relating to the EB Games robbery, on October 7, well after Smith's arrest. Moody testified at this hearing, along with one eyewitness to the EB Games robbery. By the time of the first hearing, Moody and Pulido knew that demand-note robberies had continued in the days following Walker's arrest, and at least Pulido knew that Smith had been arrested. Nevertheless, neither officer informed the prosecutor of this exculpatory information. Bail was initially set at $50,000, but was raised to $1,100,000 when additional robbery charges were added to the felony complaint. Walker had a second preliminary hearing in September 2006, at which he was held to answer for charges relating to several of the other demand-note robberies.

California Penal Code § 1054.1(e) requires pretrial disclosure of exculpatory evidence. The Code also provides that "[b]efore a party may seek court enforcement of any of the disclosures required . . . , the party shall make an informal request of opposing counsel for the desired materials and information." *Id.* § 1054.5(b). If opposing counsel fails to provide the requested information within fifteen days, then the party may seek a court order. *Id.* Upon a showing that opposing counsel has not complied with § 1054.1(e), the

court may make any order necessary to enforce the disclosure requirement. *Id.*

Relying upon the assertions in Moody's reports that the demand-note robberies had ceased upon Walker's arrest, Walker's defense attorneys, Alla Eksler and Meredith Rudhman, initially did not make informal discovery requests regarding whether the demand-note robberies had in fact continued after that time. Sometime after the first hearing, however, Walker's defense attorney learned that Walker's fingerprints did not match the fingerprints obtained from the scene of the EB Games robbery. As their investigation increasingly suggested Walker's innocence, his lawyers made the required informal discovery requests, asking the prosecutor to double-check the accuracy of Moody's statements. Walker's attorneys did not receive anything through informal discovery. Instead, the government responded, eventually, by objecting to the request as too burdensome, although the record does not reflect exactly when it did so.

Rudhman then filed a formal discovery request on February 8, 2007. Again, the prosecution opposed this request as too burdensome, but the court eventually granted the request and ordered the production of reports of similar robberies in the area after Walker's arrest. Sometime in late May or early June, Walker's attorneys finally received reports of the Golden Bird and Burger King robberies. Eksler obtained a second formal discovery order on September 5. On October 4, she received "a number of reports of note robberies, a few before Mr. Walker's arrest and many after his arrest that were the same type of modus operandi or the same type of robberies." Strikingly, the demand note from one of the robberies with which Walker was charged shared

the same misspelling as the demand note from one of these robberies: The notes both urged the recipient to hurry and hand over money, so that the robber would not "strat [sic] shooting."

After requesting additional police records, Eksler learned of Smith's arrest. She then arranged for a comparison of Smith's fingerprints with those recovered from the scene of the EB Games robbery. The fingerprints matched. Eksler notified the prosecutor of this match on November 26, and Walker's case was dismissed the same day. At that point, Walker had been in jail for 27 months. Afterward, Eksler filed a motion for a finding of factual innocence, which the court granted.

## D. Walker's § 1983 suit

Walker subsequently brought this § 1983 suit against Moody and Pulido, raising two claims.

Walker first argued that Moody and Pulido had deprived him of liberty without due process of law by failing to disclose material exculpatory evidence. At trial, the district court gave the jury the following instructions:

### JURY INSTRUCTION NO. 21

The Fourteenth Amendment to the United States Constitution provides that no public official shall deprive any person of liberty without due process of law.

When someone has been arrested and charged with a crime, the due process clause

of the Fourteenth Amendment requires public officials, such as police officers and detectives, to disclose all the information and evidence in their possession which may tend to show that the accused person did not commit the crime. In other words, the Constitution compels police officers and detectives to disclose exculpatory information along with any evidence which tends to show the accused's guilt. Withholding or concealing exculpatory information violates the accused's right not to be deprived of liberty without due process of law.

In order for evidence to be "exculpatory," it must be:

(a) favorable to the accused; and

(b) material to his guilt or innocence.

Evidence is "material" if there is a reasonabl[e] probability that it would have caused a different result in the case.

The court also read the jury a related instruction:

**JURY INSTRUCTION NO. 22**

In order to prevail on his claim that defendants Steven Moody and Robert Pulido, or either of them, concealed or failed to turn over exculpatory evidence, the plaintiff must prove that:

(1) defendants Steven Moody and Robert Pulido, or either of them, concealed or failed to turn over exculpatory evidence; and

(2) defendants Steven Moody and Robert Pulido, or either of them, acted with deliberate indifference to or reckless disregard for the plaintiff's rights or for the truth in withholding evidence from prosecutors.

To act with "deliberate indifference" means to make a conscious choice to disregard the consequences of one's acts or omissions.

Conduct is in reckless disregard of the plaintiff's rights if, under the circumstances, it reflects complete indifference to the plaintiff's rights, or the defendant acts in the face of a perceived risk that his actions will violate the plaintiff's rights under federal law.

The jury returned a verdict for Walker on this claim, answering affirmatively when asked whether Moody and Pulido "violated plaintiff Michael Walker's constitutional rights by withholding or concealing evidence that tended to show that plaintiff was innocent of the criminal charges against him." The jury awarded compensatory damages of $106,000.00.

Walker also claimed that Moody and Pulido had maliciously prosecuted him without probable cause and for the purpose of violating his constitutional rights.[2]  The jury

---

[2] As to this claim, the district court instructed the jury as follows:

**JURY INSTRUCTION NO. 23**

In order to prevail on his malicious prosecution claim under § 1983, the plaintiff must prove that:

(1) the defendants Steven Moody or Robert Pulido, or either of them, caused Plaintiff to be prosecuted;

(2) they did so with malice and without probable cause;

(3) they did so for the purpose of violating the plaintiff's constitutional rights; and

(4) the criminal proceeding terminated in the plaintiff's favor.

"Probable cause" exists when, under all of the circumstances known to the officers at the time, an objectively reasonable police officer would conclude there is a fair probability that the plaintiff has committed or was committing a crime.

If the plaintiff was held to answer following a preliminary hearing in the underlying criminal action, you are to presume that there was probable cause to arrest the plaintiff, unless plaintiff proves by a preponderance of the evidence that the prosecution of the plaintiff was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct taken in bad faith.

returned a verdict against Walker on the malicious prosecution claim, which Walker did not appeal.

Moody and Pulido then moved for judgment as a matter of law, under Federal Rule of Civil Procedure 50(b). The court denied the motion, and awarded Walker costs and attorney's fees. Moody and Pulido now appeal both the denial of judgment as a matter of law and the award of attorney's fees.

We review de novo the denial of a renewed motion for judgment as a matter of law, "view[ing] the evidence in the light most favorable to the nonmoving party . . . and draw[ing] all reasonable inferences in his favor." *Barnard v. Theobald*, 721 F.3d 1069, 1075 (9th Cir. 2013).

## II.

"Section 1983 creates a private right of action against individuals who, acting under color of state law, violate federal constitutional or statutory rights. Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Hall v. City of L.A.*, 697 F.3d 1059, 1068 (9th Cir. 2012) (internal quotation marks and citations omitted). Moody and Pulido challenge the judgment against them on the ground that the Constitution does not confer on Walker the right that the jury found them to have violated. We hold that the Constitution does protect Walker from prolonged detention when the police, with deliberate indifference to, or in the face of a perceived risk that, their actions will violate the

"Malice" means to act with ill will, or spite, or for the purpose of causing a constitutional injury to another.

plaintiff's right to be free of unjustified pretrial detention, withhold from the prosecutors information strongly indicative of his innocence, and so affirm.

**1.** Moody and Pulido first assert that "the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment[,] governs a pretrial loss of liberty." Not so.

*Rivera v. County of Los Angeles* squarely rejected that proposition earlier this year. 745 F.3d 384 (9th Cir. 2014). As *Rivera* explained, "[p]recedent demonstrates . . . that post-arrest incarceration is analyzed under the Fourteenth Amendment alone." *Id.* 389–90 (citing *Baker v. McCollan*, 443 U.S. 137, 145 (1979); *Lee v. City of L.A.*, 250 F.3d 668, 683–85 (9th Cir. 2001)).[3]  On that ground, *Rivera* rejected a claim, brought under § 1983, that the plaintiff's post-arrest incarceration on the basis of a warrant naming another man, after jailors should have known of the error, violated the Fourth Amendment. *Id.*  *Rivera* forecloses Moody and Pulido's Fourth Amendment-based argument here.

---

[3] A plurality of Supreme Court justices suggested otherwise in *Albright v. Oliver*, 510 U.S. 266 (1994). The plurality reasoned that "[t]he Framers considered the matter of *pretrial* deprivations of liberty and drafted the Fourth Amendment to address it," rather than the Fourteenth. *Id.* at 274 (emphasis added); *see also Gerstein v. Pugh*, 420 U.S. 103, 125 n.27 (1975). *Rivera* issued long after *Albright* and *Gerstein* and is binding on us. *See Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003) (en banc).

*Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002) is not inconsistent with *Rivera*. *Galbraith* concerned only the initial decision to arrest and prosecute, while *Rivera* and this case concern post-arrest incarceration. *See Galbraith*, 307 F.3d at 1122–23. It is *Rivera*'s analysis that controls here.

Walker's claim can be characterized as one, like *Rivera*, of mistaken identity: Moody and Pulido took him for the robber, who was actually Stanley Smith.  On a similar basis, the Second Circuit characterized a lawsuit, like this one, seeking compensation for an extended pre-trial detention "stemming directly from . . . law enforcement officials' refusal to investigate available exculpatory evidence" or to disclose it to the prosecutors, as "a case of mistaken identity." *Russo v. City of Bridgeport*, 479 F.3d 196, 208, 199 (2d Cir. 2007).

Even if one rejects the precise analogy, *Rivera* made clear that "there is no principled distinction between claims of mistaken identity and other claims of innocence."  745 F.3d at 391 n.4 (citing *Baker*, 443 U.S. at 145–46).  "When . . . a person asserts that he is a victim of mistaken identities, he in effect is pressing a claim of innocence in fact—a claim not analytically distinct from any other factual defense (say, an alibi defense or a defense premised on a lack of specific intent) tendered by a person whom the police arrest in pursuance of a warrant issued by a judge or magistrate." *Brady v. Dill*, 187 F.3d 104, 112 (1st Cir. 1999).

As there is no "principled distinction between" Walker's case and the case of mistaken identity considered in *Rivera*, 745 F.3d at 391 n.4, we conclude that his claim is covered by the Fourteenth Amendment's guarantee of due process, and not by the Fourth Amendment.[4]

---

[4] Contrary to our conclusion in *Rivera*, the Second Circuit has held that certain constitutional protections against post-arrest detention are grounded in the Fourth Amendment, not the Fourteenth.  *See Russo*, 479 F.3d at 209.  *Russo* considered the seven-month detention of a suspect

**2.** The jury found that Moody and Pulido withheld or concealed exculpatory evidence from the prosecutors with deliberate indifference to or reckless disregard for Walker's rights or for the truth. Moody and Pulido argue that the Fourteenth Amendment offers no protection from such misconduct unless the plaintiff's right to a fair *trial* is compromised. Describing Walker's claim as one based on the right to disclosure of certain exculpatory evidence first recognized in *Brady v. Maryland*, 373 U.S. 83 (1963), they assert that the right is not implicated where, as here, a defendant never goes to trial, let alone suffers a wrongful conviction.[5]

---

in the face of strongly exculpatory evidence that investigating officers failed to pursue or to disclose to prosecutors. *See id.* at 206.

Although *Russo* traced the constitutional right against such misconduct to the Fourth Amendment, its analysis was little different from the approach we take to asserted deprivations of due process. That case evaluated whether the defendants' conduct "'shock[ed] the conscience,'" *id.* at 210 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998))—a standard originally developed to measure "the cognizable level of executive abuse of power" necessary to sustain an action vindicating the right to due process, *Lewis*, 523 U.S. at 846, and which we typically employ in that context, *see, e.g.*, *Gantt v. City of L.A.*, 717 F.3d 702, 707 (9th Cir. 2013). And *Russo*'s analysis of the prolonged detention claim abjured any reference to probable cause, which Moody and Pulido characterize as the "touchstone" of the Fourth Amendment. In any event, several other circuits analyze claims of the sort considered in *Russo* as violations of due process, not the Fourth Amendment. *See infra* Part II.2.

[5] *Smith v. Almada*, 640 F.3d 931 (9th Cir. 2011), reserved the related question of whether a defendant acquitted at trial can claim under 42 U.S.C. § 1983 a violation of his *Brady* rights. *See id.* at 941 (Gwin, J., specially concurring); *id.* at 940 (Gould, J., concurring). We do not answer that question today.

The premise of Moody and Pulido's argument is incorrect. To resolve this appeal, we need not decide the scope of the protections established by *Brady* and its progeny, because Walker's claim sounds in the right first alluded to in *Baker*, 443 U.S. 137, not *Brady*. Where, as here, investigating officers, acting with deliberate indifference or reckless disregard for a suspect's right to freedom from unjustified loss of liberty, fail to disclose potentially dispositive exculpatory evidence to the prosecutors, leading to the lengthy detention of an innocent man, they violate the due process guarantees of the Fourteenth Amendment.

*Baker* assumed, without deciding, that,

> depending on what procedures the State affords defendants following arrest and prior to actual trial, mere detention pursuant to a valid warrant but in the face of repeated protests of innocence will after the lapse of a certain amount of time deprive the accused of "liberty . . . without due process of law."

443 U.S. at 145 (quoting U.S. Const. amend. XIV, § 2) (omission in original). In *Lee v. City of Los Angeles*, we answered the question *Baker* had reserved, explaining that "'continued detention after it was or should have been known that the detainee was entitled to release'" can violate the Fourteenth Amendment. 250 F.3d 668, 683 (9th Cir. 2001) (quoting *Cannon v. Macon Cnty.*, 1 F.3d 1558, 1563 (11th Cir. 1993)). Usually, claims of such a violation fall into "at least one of two categories: (1) the circumstances indicated to the defendants that further investigation was warranted, or (2) the defendants denied the plaintiff access to the courts for an extended period of time." *Rivera*, 745 F.3d at 390–91.

Walker asserts a variant of the first of those two categories. Moody and Pulido's silence in the face of compelling exculpatory evidence breached their duty of disclosure to authorities competent to act on the information. Although Moody and Pulido's failure to disclose is one step removed from a failure to investigate, that difference is not pertinent where, as here, the suppressed exculpatory evidence was potentially dispositive—and, indeed, proved dispositive.

Under § 1983, "a [person is] responsible for the natural consequences of his actions." *Monroe v. Pape*, 365 U.S. 167, 187 (1961), *overruled in part on other grounds by Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Thus, a § 1983 defendant is liable for "setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 430 (9th Cir. 2010) (internal quotation marks omitted). Here, "the natural consequence[]" of Moody and Pulido's conduct was that Walker remained in detention until the exculpatory information was disclosed to the prosecutors and then to Walker's lawyers. Moody and Pulido enhanced the likelihood of that outcome because they not only failed accurately to disclose the continuation of the crime spree after Walker's arrest, they affirmatively *misrepresented* the truth as to that fact in reports on which the prosecutors and defense counsel relied, writing that the robberies ended with Walker's removal from the streets; they also failed to report Smith's arrest for the later robberies.

In this sense, Moody and Pulido "concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute [Walker] and whether (that decision having been

made) to continue prosecuting him." *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988). Indeed, once the prosecutors were alerted that the spree of demand-note robberies had in fact continued after Walker's detention and the connection to the parallel investigation of Stanley Smith was made, minimal additional investigation of physical evidence already in the government's possession was enough to secure Walker's release. Where a simple fingerprint comparison can secure the release of an innocent person, we have held, failure to conduct such a comparison constitutes a violation of due process, *see Lee*, 250 F.3d at 684, particularly where the putative "investigation" requires only review of "an easily available piece of physical evidence" already in the government's possession. *Russo*, 479 F.3d at 209.

*Rivera* held that a *jailor* has no duty to investigate the repeated claims of innocence of a suspect held pursuant to a court order. 745 F.3d at 392.[6] In doing so, it reaffirmed the longstanding rule that the Constitution usually does not require a jailor to release a suspect committed by court order

---

[6] *Rivera* considered a lawsuit brought against Los Angeles County, the Los Angeles County Sheriff's Department, San Bernardino County, and the San Bernardino County Sheriff's Department on the claim that, inter alia, Rivera was wrongly detained on a warrant naming another man. 745 F.3d at 386–87. His claim of ongoing wrongful detention was directed at the Los Angeles defendants, into whose custody the San Bernardino defendants transferred him after his arrest. *Id.* at 387, 391–92. As the Los Angeles defendants were just his custodians, *Rivera*'s analysis of his claim prior to the preliminary hearing focused on that relationship. Thus, *Rivera* explained that "a *jailor* need not independently investigate all uncorroborated claims of innocence if the suspect will soon have the opportunity to assert his claims in front of a judge," an opportunity made available to Rivera the day after his transfer to the custody of the Los Angeles defendants. *Id.* at 391–92 (emphasis added).

to his custody. *See, e.g.*, *Hoffman v. Halden*, 268 F.2d 280, 300 (9th Cir. 1959), *overruled on other grounds by Cohen v. Norris*, 300 F.2d 24 (9th Cir. 1962); *Francis v. Lyman*, 216 F.2d 583, 585 (1st Cir. 1954). *Hernandez v. Sheahan*, on which *Rivera* relied, reasoned that the contrary rule "would create a substantial possibility that by presenting his contention [of misidentification] over and over even a guilty suspect would eventually find a deputy who did not understand the weight of the evidence and let him go." 455 F.3d 772, 777 (7th Cir. 2006). Such a result would "frustrate the public interest in carrying out the criminal law." *Id.* And, as *Lumbermens Mutual Casualty Co. v. Rhodes*—on which *Rivera* also relied—indicated, the erroneous release of a suspect would "normally subject [the jailor] to criminal penalty if he voluntarily allows . . . a prisoner to escape." 403 F.2d 2, 7 (10th Cir. 1968).

Those concerns have no application where, as here, the defendants are investigating police officers accused of failing to disclose potentially dispositive exculpatory information to the prosecutors to whom they report.[7] Unlike a jailor, "[o]ne standard police function is to provide information to the prosecutor and the courts. Thus, a police officer sometimes may be liable if he fails to apprise the prosecutor or a judicial officer of known exculpatory information." *Brady*, 187 F.3d at 114. Prosecutors, unlike jailors, wield the authority to secure a suspect's release by dismissing pending charges. And prosecutors, unlike jailors, have a global perspective on the case and a rigorous understanding of the applicable law,

---

[7] The jury's instructions in this case did not suggest that Moody and Pulido had some sort of independent duty to secure Walker's release or even to investigate his claims.

attributes that minimize the danger they will weigh the evidence incorrectly.

Moreover, the preliminary hearings held in Walker's case did not afford him protection from Moody and Pulido's misconduct. In California, a criminal defendant arrested and arraigned on a felony complaint, as Walker was, is entitled to a preliminary hearing at which a judge "determine[s] whether there is probable cause to conclude that the defendant has committed the offense charged." *Galindo v. Super. Ct.*, 50 Cal. 4th 1, 8 (2010). The protection that such hearings provide against erroneous deprivations of liberty is only as good as the information on which the decisions of the prosecutor and judge are based. Absent a requirement that police officers disclose to the prosecution compelling exculpatory evidence in their possession without unreasonable delay, the post-arrest hearings to which an accused is entitled do not mitigate the risk that he may be erroneously held to answer criminal charges that a prosecutor would otherwise not pursue.

Before the first preliminary hearing in Walker's case, both Moody and Pulido knew that the spree of demand-note robberies had continued after Walker's detention. At least Pulido knew that Smith had been arrested on suspicion of having committed those robberies. And the police already had physical possession of the evidence necessary to establish Smith's presence at the scene of the EB Games robbery—namely, his fingerprints. But as far as the record shows, Moody and Pulido did not disclose any of that knowledge to the prosecutors pursuing Walker's case, either before or after the initial preliminary hearing. To the contrary, they affirmatively misrepresented—twice—highly material facts: Moody's report on the EB Games robbery,

completed prior to the first preliminary hearing, stated that Walker's detention brought the spate of demand-note robberies to an end.  And his second report, completed after the first preliminary hearing, but before the second, reiterated that misrepresentation.  Pulido approved both documents. Prosecutors, relying on those reports, could not dismiss charges on the basis of facts of which they were unaware. Correcting the error could be accomplished only by accurate disclosure of information held by Moody and Pulido alone and unknown to the prosecutors.

Nor did Moody and Pulido correct the misinformation provided to the prosecutors, or provide accurate information concerning Smith's arrest and the consequent end of the crime spree, during the two-year period Walker remained in pretrial detention.  A police officer's continuing obligation to disclose highly exculpatory evidence to the prosecutors to whom they report is widely recognized in the circuits. *Jones v. City of Chicago*, for example, sustained a judgment against police officers who failed to tell prosecutors about strongly exculpatory evidence against a suspect whose trial had begun; prosecutors later learned the truth of the matter and dropped all charges against him.  856 F.2d at 988–91.  "If police officers have been instrumental in the plaintiff's continued confinement or prosecution," *Jones* explained, "they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.  They cannot hide behind the officials whom they have defrauded." *Id.* at 994.  *Sanders v. English* similarly held that an investigating officer's "deliberate failure to disclose . . . undeniably credible and patently exculpatory evidence to the prosecuting attorney's office plainly exposes him to liability under § 1983," where that failure led to the prolonged detention of a man who otherwise would have been released.

950 F.2d 1152, 1162 (5th Cir. 1992). *Russo* reversed the grant of summary judgment to investigating police officers whose willful failure to disclose to the prosecutor strong exculpatory evidence might have violated the Constitution—albeit the Fourth Amendment, rather than the Fourteenth—where their conduct enabled the prolonged detention of a man who had been arraigned but might have been released had prosecutors known the truth. 479 F.3d at 201, 209–10. And *Brady* recognized, without deciding, the possibility that investigating police officers might be liable for a prolonged detention resulting "from the officers' failure to deliver material information to competent authorities." 187 F.3d at 114.[8]

We emphasize the narrowness of the constitutional rule we enforce today, which is restricted to detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the

---

[8] In a related context, *Sutkiewicz v. Monroe County Sheriff* held that the district court improperly excluded from evidence audio tapes containing exculpatory information that investigating officers allegedly failed to disclose to the prosecutor. 110 F.3d 352, 357–58, 361 (6th Cir. 1997). *Sutkiewciz* concluded that the tapes were relevant to the plaintiff's claims under § 1983 of malicious prosecution and false imprisonment. "[E]ven though an officer is not obligated to actively search for exculpatory evidence," the Sixth Circuit reasoned in part, "he has a duty to disclose those facts and circumstances to the prosecutor." *Id.* at 358.

In addition, several circuits recognize that "someone who is wrongly imprisoned as a result of mistaken identity [may] state a constitutional claim against his jailers based on their failure to ascertain that they had the wrong man." *Gray v. Cuyahoga Cnty. Sheriff's Dep't*, 150 F.3d 579, 582 (6th Cir. 1998), *as amended*, 160 F.3d 276 (6th Cir. 1998); *see also Cannon*, 1 F.3d at 1563.

officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks.  We explain each limitation in turn.

**A.**  As to the length and process afforded by the state, *Baker* held that mistaken detention for three days on the basis of a seemingly valid warrant did not violate due process.  *See* 443 U.S. at 145.  As we explained in *Lee*, however, *Baker* also "stated that the mistaken incarceration of an individual in other circumstances may violate his or her right to due process 'after the lapse of a certain amount of time,' 'depending on what procedures the State affords defendant[] following arrest and prior to trial.'"  *Lee*, 250 F.3d at 684 (quoting *Baker*, 443 U.S. at 144–45) (omission in original). In that case, we held actionable the one-day detention of a mentally incapacitated man in the absence of probable cause, reversing the district court's dismissal of the claim under Federal Rule of Civil Procedure 12(b)(6).  *See id.* at 684–85.

Here, Walker was detained for 27 months after preliminary hearings that, as noted, offered him no protection from Moody and Pulido's misconduct, because the exculpatory information was withheld both before and after the hearings.  That period of time, under any measure, is sufficiently lengthy to trigger the narrow due process right at issue here.  *Russo*, for example, held that a 217-day and even a 68-day detention were lengthy enough to "carr[y] constitutional implications."  479 F.3d at 209.[9]

---

[9] Although the district court did not instruct the jury as to this element of the cause of action, Moody and Pulido failed to object to that omission, as required by Federal Rule of Civil Procedure 51.  "If a party does not properly object to jury instructions before the district court, we may only consider 'a plain error in the instructions that . . . affects substantial

**B.** As to the significance of the evidence Moody and Pulido withheld from the prosecutors, the district court instructed the jury that "exculpatory" evidence was evidence both "favorable to the accused" and "material to his guilt or innocence." Evidence is "material," the district court continued, "if there is a reasonabl[e] probability that it would have caused a different result in the case."

We can assume here that this sort of due process claim is actually triggered by the failure to disclose evidence that is not merely material but *strongly* indicative of the plaintiff's innocence. Although the jury was not specifically so instructed, the evidence proved in fact nearly dispositive, not merely material, to the prosecutor's decision to continue prosecuting Walker. Once disclosed to the prosecutor, the withheld information *did* alter that decision. With minimal further investigation, the evidence prompted the prosecutor to drop all charges against Walker and led the judge to declare Walker factually innocent. Thus, any instructional error—to which Moody and Pulido in any case did not object—is harmless. *See* Fed. R. Civ. P. 61.

**C.** In the context of a § 1983 suit against police officers for a due process violation, official conduct violates due process "only when [it] 'shocks the conscience,'" a standard satisfied in circumstances such as these by conduct that either consciously or through complete indifference disregards the

---

rights.'" *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1230 (9th Cir. 2011) (quoting Fed. R. Civ. P. 51(d)(2)) (alteration in original). We hold that the failure to instruct the jury as to this element of the cause of action did not affect Moody and Pulido's substantial rights. Indeed, it was entirely harmless. *See* Fed. R. Civ. P. 61. The length of Walker's detention went uncontested at trial and, on appeal, Moody and Pulido concede that Walker "spent 27 months in jail."

risk of an unjustified deprivation of liberty. *Gantt*, 717 F.3d at 707.

> Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives.

*Id.* (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)).

Deliberation is impractical "where a suspect's evasive actions force the officers to act quickly," *Wilkinson*, 610 F.3d at 554, or when dealing with other "fast paced circumstances presenting competing public safety obligations," *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008). Examples of such circumstances include chasing a  fleeing suspect or responding to gunfire in crowded public spaces. *See Porter*, 546 F.3d at 1139.

In contrast, "the decision whether to disclose or withhold exculpatory evidence is a situation in which 'actual deliberation is practical,'" such that deliberate indifference to individual rights—rather than intent to injure—is enough. *Tennison v. City & Cnty. of S.F.*, 570 F.3d 1078, 1089 (9th Cir. 2008) (quoting *Osborn*, 546 F.3d at 1137). In *Gantt*, we expressed approval of the following definition of deliberate indifference:

Deliberate indifference is the conscious or reckless disregard of the consequence of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.

*Gantt*, 717 F.3d at 708.

The jury here received an instruction fully consistent with the holding in *Gantt*. The district court explained that Walker needed to demonstrate that Moody and Pulido "acted with deliberate indifference to or reckless disregard for the plaintiff's rights or for the truth in withholding evidence from prosecutors." The instructions went on to define "deliberate indifference" as "a conscious choice to disregard the consequences of one's acts or omissions," and "reckless disregard" as "complete indifference to the plaintiff's rights" or action "in the face of a perceived risk" that the plaintiff's rights will be violated. This mens rea standard is a subjective one and describes a culpable state of mind. The jury's determination that Moody and Pulido acted with deliberate indifference or reckless disregard for Walker's rights thus satisfies the standard applicable to violations of due process.

\* \* \*

In sum, we hold that the jury instructions described a cognizable constitutional claim. The district court's enforcement of the jury verdict thus stands.[10]

---

[10] Moody and Pulido do not independently appeal the denial of qualified immunity on the ground that even if the jury was properly instructed, "the right at issue was [not] 'clearly established' at the time of [their] alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). They have thus forfeited any such objection for failure to assert it "specifically and distinctly" in their opening brief. *See, e.g.*, *U.S. Fidelity & Guar. Co. v. Lee Invs. LLC*, 641 F.3d 1126, 1136 n.9 (9th Cir. 2011).

Nor could Moody and Pulido have asserted that the right they violated was not clearly established. They *concede* "that withholding exculpatory evidence may cause constitutional injury not only at the criminal trial, but during the pretrial stages of the criminal proceedings as well," but they argue that this rule applies only if their conduct violates the standards set by the Fourth Amendment. Immunity, however, turns "on an officer's duties, not on other aspects of the constitutional violation." *Stoot v. City of Everett*, 582 F.3d 910, 927 (9th Cir. 2009). Uncertainty regarding the procedural niceties of privately enforcing the relevant constitutional prohibition—including knowledge of the particular constitutional provision implicated by the violation—does not immunize state officials from liability. *See Southerland v. City of N.Y.*, 680 F.3d 127, 160 (2d Cir. 2011); *Alexander v. Perrill*, 916 F.2d 1392, 1398 n.11 (9th Cir. 1990). Where, as here, officers recognize that their conduct "*could* ripen into" an actionable violation on the basis of subsequent contingencies beyond their control, they are not immune from suit. *Stoot*, 582 F.3d at 927. Commonsense confirms Moody and Pulido's concession that the withholding of exculpatory evidence can cause constitutional injury; that concession recognizes "the almost tautological conclusion that an individual in custody has a constitutional right to be released from confinement after it was or should have been known that the detainee was entitled to release." *Schneyder v. Smith*, 653 F.3d 313, 330 (3d Cir. 2011) (internal quotation marks omitted).

## III.

Moody and Pulido's appeal from the award of attorney's fees is contingent on their appeal of the judgment. They have not brought a particularized challenge to the calculation of the attorney's fees awarded to Walker by the district court or alleged an abuse of discretion. *See Corder v. Brown*, 25 F.3d 833, 836 (9th Cir. 1994) ("[A] district court's award of attorney's fees . . . is reviewed for an abuse of discretion."). Under 42 U.S.C. § 1988, the district court has discretion to "award a reasonable attorney's fee to prevailing parties in civil rights litigation." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Because we affirm the district court's judgment, we likewise affirm the award of fees to the prevailing party, Walker.

**AFFIRMED.**